In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-3302, 99-4025, 99-4026, 99-4091 & 99-4092

United States of America,

Plaintiff-Appellee,

v.

Trevor Bjorkman, Paul Gunderson, Travis
Fearing, Dennis Gunderson, and Joel Hagen,

Defendants-Appellants.

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 99 CR 37--John C. Shabaz, Judge.

Argued June 8, 2001--Decided October 30, 2001

   Before Bauer, Easterbrook, and Kanne,
Circuit Judges.

   Per Curiam.  Pursuant to guilty pleas,
the five appellants were convicted of
conspiracy to possess with intent to dis
tribute and to distribute marijuana. They
raise various challenges to their
sentences. In addition, one of the appel
lants appeals the district court's denial
of his motion for substitution of
counsel, and another objects to the fine
imposed by the court. We affirm.

BACKGROUND

   The five appellants participated in a
drug operation which involved buying
marijuana from Mexican sources through
contacts in Arizona and transporting it
to Minnesota, where it was repackaged and
distributed to a group of customers. The
enterprise started some time in February
of 1996, when Paul Gunderson paid an
individual in Tempe, Arizona $10,000 to
set up a 100-pound marijuana deal. Paul
Gunderson's brother Dennis and two others
went to the marijuana source near Tuscon,
and Dennis and one other person picked up
the 100 pounds of marijuana and drove it
to Paul Gunderson's apartment in
Minnesota.

   At some point in 1996, Paul Gunderson

offered Joel Hagen a 50% interest in the drug operation. From early to mid 1996, Paul Gunderson and Hagen used a number of drivers to bring the marijuana in from Arizona, including Dennis Gunderson, Trevor Bjorkman, Travis Fearing, and Wade Stafne. These drivers brought back several loads of marijuana, each of which weighed approximately 100 pounds. The loads were delivered either to Hagen's residence or to Paul Gunderson's apartment, both in Minnesota. There, Hagen, Paul Gunderson and others repackaged the marijuana into one-pound freezer baggies and distributed it to regular customers, each of whom received between 10 and 40 pounds of marijuana. At various times during 1996, Bjorkman and Fearing played the role of "human collateral" (that is, they were held in Arizona by the marijuana suppliers until the suppliers were paid). By mid-1996, Hagen wanted out of the partnership, but he continued to receive large portions of the marijuana delivered to Paul Gunderson.

In early 1997, Hagen and Paul Gunderson had a falling out and ended their drug partnership. Thereafter, Paul and Dennis Gunderson continued to obtain marijuana from their Mexican sources in Tuscon, but they used a new set of drivers. After authorities executed a search warrant at Paul Gunderson's residence in June of 1997, Gunderson sold the operation to his brother Dennis and Dan Madsen for $100,000. Meanwhile, Hagen went into business with an individual named Scot Hendricks. Hagen arranged for deliveries of marijuana to be brought to Minnesota by couriers, including Fearing and Stafne. The marijuana was repackaged at Hagen's residence, after which Hagen and Hendricks each claimed a portion for sale. Hagen and Hendricks continued to obtain marijuana from Arizona in this manner throughout the spring and summer of 1998, receiving at least one shipment of approximately 100 pounds at Hagen's residence in May of 1998.

In August of 1998, search warrants were executed at 18 locations throughout Wisconsin and Minnesota. A search of Hagen's residence led to the seizure of $122,640, a scale, drug packaging materials, two Smith & Wesson handguns, and a clip loaded with hollow-point bullets. At Hagen's brother's residence,

police found an additional $30,000 of Hagen's money. A search of Paul Gunderson's residence yielded ten one-pound bags of marijuana and a number of firearms.

On June 3, 1999, the appellants and two others were charged in Count 1 of a superceding indictment with conspiracy to possess with intent to distribute and to distribute marijuana in violation of 21 U.S.C. sec. 846 and 841(a)(1). Consistent with then-existing case law, the indictment did not allege a quantity of marijuana. Each of the defendants pleaded guilty to Count 1, and each signed a written plea agreement. Each defendant's plea agreement provided that the offense to which he was pleading guilty exposed him to a mandatory minimum sentence of 5 years, and a maximum sentence of 40 years. The district court repeated these facts during each defendant's plea hearing, whereupon each indicated his understanding and agreement. In addition, Bjorkman's, Paul Gunderson's, and Fearing's plea agreements set out the government's position regarding the amounts of marijuana attributable to each defendant. Addressing Bjorkman and Paul Gunderson individually during their plea hearings, the district court repeated the government's position on the amounts of marijuana attributable to them. Presentence reports (PSRs) were prepared for each of the five defendants. Each PSR calculated the defendant's base offense level under the guidelines with reference to particular drug quantities. In Bjorkman's, Fearing's, and Paul Gunderson's cases, the PSR's calculation as to drug quantities fell within the ranges posited by the government in each of their plea agreements. Moreover, the PSRs found each of the five defendants accountable for quantities of marijuana well in excess of the amount triggering a sentencing exposure of 5 to 40 years.

During a joint plea hearing held for Dennis Gunderson, Paul Gunderson, Fearing, and Hagen, the government set out a detailed, consolidated factual basis which referenced quantities of marijuana. For example, the government stated that Paul Gunderson and Hagen used drivers (including Fearing, Bjorkman and Dennis Gunderson) to obtain loads of marijuana which averaged 100 pounds from Arizona, and to deliver them to Hagen or

Paul Gunderson's residences in Minnesota. The government also stated that after he fell out with Paul Gunderson, Hagen continued this practice, using Fearing and other couriers. The government made reference to various specific trips and drug quantities. Hagen, Paul Gunderson, and Fearing agreed completely with the government's proffer. Dennis Gunderson challenged the proffer only by pointing out that he had ended his involvement in the conspiracy in December of 1997. The government put forward a similar factual basis at Bjorkman's plea hearing, and while Bjorkman did not admit to all of the government's quantity calculations, he admitted that he was responsible for participating in several marijuana delivery trips which involved quantities of 40 pounds, 85-100 pounds, and further indeterminate amounts. Bjorkman further admitted that he couldn't disagree if the government suggested that it could prove the number of pounds involved by a preponderance of the evidence. At no point prior to this appeal did any of the defendants challenge the position that the mandatory minimum sentence for the offense of conviction was 5 years, or that the maximum sentence was 40 years.

After applying various guideline enhancements, the district court sentenced the appellants to prison terms ranging from 105 to 155 months in prison plus 5 years of supervised release for each, and imposed a $40,000 fine plus criminal forfeiture on Hagen. The appellants' appeal their sentences, raising two joint issues together with various individual issues. We find some of these issues meritless and do not discuss them. For those issues that we do address, we include a discussion of the facts necessary for their resolution.

DISCUSSION

A. Apprendi issue

Defendants were indicted and pled guilty before the Supreme Court decided Apprendi v. New Jersey, 530 U.S. 466 (2000). Neither the indictment nor the guilty pleas mentioned any specific quantity of marijuana, and defendants did not ask the district judge to ascertain that quantity using the reasonable-doubt standard. Our review therefore is limited to a search for plain error. See United States v.

Nance, 236 F.3d 820 (7th Cir. 2000). Defendants do not seriously deny that, if the district judge had used the reasonable-doubt standard, he would have concluded that they conspired to distribute more than 100 kilograms of marijuana (or more than 100 marijuana plants), a quantity that exposed each to a maximum of 40 years' imprisonment-- exactly as each plea agreement recited. See 21 U.S.C. sec. 841(b)(1)(B)(vii). In an effort to avoid this conclusion, defendants contend that after Apprendi drug quantity is an "element" of the offense established by sec.841 and that omission of this element means that the district court lacked jurisdiction--which would lead to reversal of the convictions and dismissal of the indictment without regard to the plain-error standard. To employ defendants' approach we would have to overrule not only Nance (which adopted the plain-error standard for review of forfeited Apprendi arguments) but also United States v. Brough, 243 F.3d 1078 (7th Cir. 2001), which held that drug quantity is not an element of sec.841 in the technical sense. Neither case is ripe for overruling; nor are we attracted to defendants' position as an original matter.

According to defendants, an indictment that does not mention an element of the offense does not confer subject- matter jurisdiction on the district court. That view is refuted by 18 U.S.C. sec. 3231, which creates jurisdiction to try charges framed by federal indictments. We held in United States v. Martin, 147 F.3d 529, 531-33 (7th Cir. 1998), and have repeated since, that district judges always have subject-matter jurisdiction based on any indictment purporting to charge a violation of federal criminal law. E.g., Hugi v. United States, 164 F.3d 378, 380 (7th Cir. 1999). Whether a particular indictment is proper is a question that the judge may decide under the authority conferred by sec.3231. Just as a civil plaintiff's failure to prove his allegations--or deficiencies that make the complaint dismissible under Fed. R. Civ. P. 12(b)(6)--do not deprive a court of jurisdiction under 28 U.S.C. sec. 1331 or sec. 1332 unless the complaint is frivolous, see Crowley Cutlery Co. v. United States, 849 F.2d 273 (7th Cir. 1988), so errors in a non-frivolous indictment do not strip the district

court of jurisdiction under sec.3231.

This is why the Supreme Court held in Johnson v. United States, 520 U.S. 461 (1997), that a conviction may be affirmed on plain-error analysis if the charge omits an element and the defendants do not object before or at trial. Neder v. United States, 527 U.S. 1, 8-15 (1999), adds that, even if the defendants do object, the omission of an element may be deemed harmless under the usual harmless-error analysis. Neither Johnson nor Neder could have been handled that way if the omission of an element deprives the district court of jurisdiction (or is a "structural" error that cannot be rectified); then the convictions in both cases should have been vacated rather than affirmed.

Two appellate courts have asserted that Apprendi problems affect the district court's "jurisdiction" to try a charge or impose a particular penalty. See United States v. Cotton, 261 F.3d 397 (4th Cir. 2001); United States v. Gonzalez, 259 F.3d 355 (5th Cir. 2001). These decisions do not explain why the problem is jurisdictional. They do not mention sec.3231, Neder, Johnson, or Martin, so none carries the power to persuade us to abandon Nance. (Chief Judge Wilkinson's dissent in Cotton relied on Johnson; the majority elected to ignore his arguments rather than respond to them.) The only court that has actually analyzed this question has held that Apprendi problems do not affect a district court's jurisdiction. See McCoy v. United States, 2001 U.S. App. Lexis 20900 (11th Cir. Sept. 25, 2001). Other appellate courts have held that omissions from indictments affecting maximum punishment under statutes other than sec.841 are not jurisdictional in nature. See, e.g., United States v. Prentiss, 256 F.3d 971 (10th Cir. 2001) (en banc); United States v. Mojica-Baez, 229 F.3d 292, 306-12 (1st Cir. 2000); Prou v. United States, 199 F.3d 37, 42-46 (1st Cir. 1999); United States v. Baucum, 80 F.3d 539, 543-44 (D.C. Cir. 1996). For the reasons covered in Martin and similar opinions, these decisions reach sound conclusions. There is no jurisdictional problem in today's case.

For that matter, we are not persuaded that Brough should be overruled and the

quantity of drugs declared to be an "element" of the offense under sec.841. Brough holds that the elements of the offense are stated in sec.841(a), and that the considerations in sec.841(b), which determine the minimum and maximum penalties, are not elements. No one (in this circuit anyway) disputes this conclusion with respect to minimum penalties established by sec.841(b). See, e.g., United States v. Hill, 252 F.3d 919, 921-22 (7th Cir. 2001) (collecting other decisions). Yet nothing in sec.841(b) distinguishes minimum from maximum penalties; if quantities that determine minimum penalties are not "elements," then quantities determining maximum penalties cannot be "elements" of the offense either.

Before Apprendi this court repeatedly held that drug types and quantities are not "elements" of the offense established by sec.841. See, e.g., United States v. Edwards, 105 F.3d 1179 (7th Cir. 1997), affirmed, 523 U.S. 511 (1998); United States v. Richardson, 130 F.3d 765, 780 (7th Cir. 1997), vacated on other grounds, 526 U.S. 813 (1999); United States v. Jackson, 207 F.3d 910, 920-21 (7th Cir. 2000), remanded, 531 U.S. 953 (2000), decision on remand, 236 F.3d 886 (7th Cir. 2001). In Edwards the Supreme Court endorsed our conclusion that the judge, rather than the jury, determines the types and quantities of drugs in prosecutions under sec.841; this holding is incompatible with a characterization of drug type and quantity as elements of the offense.

Since Edwards the Supreme Court has added, in Apprendi, that the Due Process Clause entitles defendants to decision by the trier of fact, on the reasonable-doubt standard, of any fact (other than a prior conviction) that increases the statutory maximum penalty. 530 U.S. at 490. A case coming from a state prosecution, Apprendi did not address the "elements" of sec.841 or any other federal offense and had nothing to do with the contents of the indictment. See 530 U.S. at 477 n.3 (disclaiming any reliance on, or interpretation of, the Fifth Amendment's Indictment Clause). What Apprendi held--and, we concluded in Brough, all that Apprendi holds--is that the Due Process Clause requires the trier of fact to apply the reasonable-doubt

standard. Apprendi does not rewrite or change the elements of any federal offense; it does, however, determine who must make particular decisions, and what the burden of persuasion must be.

Apprendi strongly affects how sec.841 is implemented; as we concluded in Nance and [United States v.] Westmoreland, [240 F.3d 618, 631-33 (7th Cir. 2001)] a post-Apprendi indictment should specify, and the trier of fact must be instructed to determine, not only the elements of the offense, which appear in sec.841(a), but also the events listed in sec.841(b) on which the prosecutor relies to establish the maximum sentence.

Brough, 243 F.3d at 1080 (emphasis in original). This is what other panels of our court have meant in referring to drug type and quantity loosely as elements: this word conveys the thought that drug type and quantity must be marked as a subject for the trier of fact under a reasonable- doubt standard. See, e.g., United States v. Watts, 256 F.3d 630, 631 n.2 (7th Cir. 2001); United States v. Robinson, 250 F.3d 527, 529 (7th Cir. 2001); United States v. Mietus, 237 F.3d 866, 874 (7th Cir. 2001). But this is a far cry from saying--which none of our opinions has done--that without an allegation of drug type and quantity in the indictment, there is no offense at all. That's what real "element" status means, and that status is one that we have repeatedly rejected--not only in Brough but also in Talbott v. Indiana, 226 F.3d 866, 869-70 (7th Cir. 2000), Hernandez v. United States, 226 F.3d 839 (7th Cir. 2000), and many other cases. Even the ninth circuit, which in United States v. Buckland, 259 F.3d 1157 (9th Cir. 2001), rehearing en banc granted, 2001 U.S. App. Lexis 20432 (Sept. 14, 2001), disagreed with Brough's holding that sec.841 as written is constitutional, agreed with its conclusion that drug type and quantity is not an "element" of the sec.841 offense in the strong sense.

Thus we repeat what was said in Brough, but now with emphasis: "a post-Apprendi indictment should specify, and the trier of fact must be instructed to determine, not only the elements of the offense, which appear in sec.841(a), but also the events listed in sec.841(b) on which the

prosecutor relies to establish the maximum sentence." In federal practice the prosecutor and court put an issue before the jury by including it in the indictment; thus the "should" clause in Brough and many other of this court's opinions. But only the "must" clause is a constitutional imperative after Apprendi. If the indictment does not include type or quantity, and the defendant does not object, then review is for plain error under Nance, and not for any different standard (such as lack of jurisdiction or failure to state an offense).

Defendants failed to object to this indictment in the district court and thus waived all contentions that could have been presented before trial--including any objections to the indictment other than failure to state an offense. See Fed. R. Crim. P. 12(b)(2), (f). By pleading guilty they did not waive the requirement of Apprendi that drug type and quantity be determined by the trier of fact beyond a reasonable doubt (to the extent they affect the statutory maximum), for sentencing came after the plea. But at sentencing these defendants did not make an Apprendi-like argument and thus forfeited it, restricting our review to a search for plain error. None of the defendants even asserts that he was responsible for less than 100 kilograms of marijuana, so, as we concluded at the beginning of this section, no injustice has been done and the requirements forreversal on plain-error review have not been met. See United States v. Olano, 507 U.S. 725 (1993).

B.  Paul Gunderson/Hagen Issue

Paul Gunderson (Gunderson) and Hagen challenge the enhancement of their sentences under U.S.S.G. sec. 2D1.1(b)(1). That section provides for a two-level increase in a defendant's base offense level if a dangerous weapon was possessed in connection with a drug offense. In applying sec. 2D1.1(b)(1), we have repeatedly held that "the Government bears the initial burden of demonstrating that the defendant possessed a weapon in a place where drugs were present," and that "once the Government meets its burden, the defendant must demonstrate that it was clearly improbable that the weapon was connected to the offense." United States v. Booker, 248 F.3d 683,

689 (7th Cir. 2001). See also United States v. Tyler, 125 F.3d 1119, 1122 (7th Cir. 1997). Gunderson and Hagen argue that in so holding we have impermissibly placed upon the defendant the burden to disprove an aggravating sentencing factor, in violation of due process.

Unfortunately for Gunderson and Hagen, we have already rejected this argument. See United States v. Durrive, 902 F.2d 1221, 1230-31 (7th Cir. 1990). Gunderson and Hagen argue that their argument was not "squarely presented" in Durrive. However, in Durrive we characterized the defendant's argument as "implying that section 2D1.1(b)(1) is unconstitutional because [it] improperly places the burden on the defendant to show that the sentencing court should not apply the enhancement provision," in violation of due process. In rejecting this argument, we cited cases from other circuits which squarely addressed and rejected the very argument that Gunderson and Hagen raise. See United States v. Restrepo, 884 F.2d 1294, 1296 (9th Cir. 1989); United States v. McGhee, 882 F.2d 1095, 1097-99 (6th Cir. 1989). Moreover, we noted that Application Note 3 to sec. 2D1.1(b)(1) (which provides that "[t]he [upward] adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense") merely sets forth an "exception" to sec. 2D1.1(b)(1), and we cited Restrepo for the proposition that the government need only prove that the weapon was "possessed" during the offense, and not that it was connected to the offense. See Durrive, 902 F.2d at 1232.

We see no reason to depart from these conclusions. Under sec. 3B1.1, the government bears the burden to prove an aggravating circumstance--that the defendant possessed a weapon in a place where drugs were present. Once it has done so, the enhancement may (indeed must) be applied, and it is proper to require the defendant to bear the burden of proving the exception recognized in Application Note 3 in order to avoid the application of an otherwise properly supported enhancement. This conclusion is consistent with the language of Application Note 3, with due processprinciples, and with the holdings of the majority of circuits that have

addressed the issue. See United States v. Hall, 46 F.3d 62, 63 (11th Cir. 1995); United States v. Ortiz-Granados, 12 F.3d 39, 41 (5th Cir. 1994); United States v. Roberts, 980 F.2d 645, 647 (10th Cir. 1992); United States v. Corcimiglia, 967 F.2d 724, 727-28 (1st Cir. 1992); Restrepo, 884 F.2d at 1296; McGhee, 882 F.2d at 1097-99. But see United States v. Khang, 904 F.2d 1219, 1221-24 (8th Cir. 1990) (holding that the government bears the burden under sec. 2D1.1(b)(1) to show that the weapon was connected to the offense); United States v. Price, 13 F.3d 711, 733 (3d Cir. 1994) (assuming without analysis that the government bears the burden under sec. 2D1.1(b)(1) to demonstrate that it was not clearly improbable that the defendant's gun was possessed in furtherance of the aims of the charged conspiracy).

Gunderson and Hagen argue in the alternative that they have met their burden to show that it was clearly improbable that the weapons discovered at their residences were connected to the offense. Because the district court'sconclusion to the contrary is a factual determination, we review it for clear error. See United States v. Cain, 155 F.3d 840, 843 (7th Cir. 1998).

We find their argument meritless. In searching Hagen's basement (a location where marijuana had been delivered and divided), police found $122,640 in cash, a scale, two handguns, and a clip loaded with hollow-point bullets. Money was found in a safe together with the handguns. Hagen provided affidavits of two individuals who claimed that they, not Hagen, owned the guns, and that they had stored them at Hagen's residence. One of the affiants averred that he left the guns at Hagen's residence one week before they were seized. Another stated that he never saw Hagen touch the gun that he left at his residence, and that he was not aware that it was used for illegal activities. However, the district court was not required to credit these affidavits. In addition, even if it is true that some or all of the guns were left at Hagen's residence only one week before the search, this would not prove that it is "clearly improbable" that they were connected to the offense. The charged offense was conspiracy, and the conspiracy was ongoing one week before

the search warrant was executed. Further, Hagen has not presented any evidence suggesting that he withdrew from the conspiracy prior to that time. Given that the guns were found in a residence where drugs were delivered and handled, that they were found in close proximity to the proceeds from the crime, and that drug paraphernalia was also found in the house, the court did not clearly err in awarding the sec. 2D1.1(b)(1) enhancement to Hagen. See United States v. Brack, 188 F.3d 748, 763 (7th Cir. 1999) (affirming a sec. 2D1.1(b)(1) enhancement for a defendant where guns were found at a "stash house" to which the defendant had access, even accepting defendant's claim that he was merely storing the guns at a co-conspirator's request); United States v. Grimm, 170 F.3d 760, 767 (ruling that "guns found in close proximity to illegal drugs are presumptively considered to have been used in connection with the drug trafficking offense"); United States v. Johnson, 227 F.3d 807, 814 (ruling that "the proximity of a weapon to drug proceeds provides a sufficient nexus to conclude that it was not clearly improbable that the gun was connected with the offense.") (citation and internal quotation omitted); United States v. Cashman, 216 F.3d 582, 588 (7th Cir. 2000) (affirming enhancement under sec. 2D1.1(b)(1) where a gun was found in a motor home together with a scale and other drug paraphernalia).

For similar reasons, we also uphold the district court's application of the sec. 2D1.1(b)(1) enhancement to Gunderson. The search of Gunderson's residence (where marijuana was delivered and repackaged), uncovered ten one-pound bags of marijuana and a number of firearms. The only firearm which was not found in a gun locker was a shotgun which Gunderson's wife testified belonged to another individual who used it for skeet shooting. Nevertheless, because the guns were found in a "stash house" in proximity to marijuana, the district court did not commit clear error when it found that it was not clearly improbable that these weapons were possessed in connection with the marijuana conspiracy.

C.  Fearing Issue

Fearing challenges the district court's enhancement of his sentence under

U.S.S.G. sec. 3B1.1(c) for being a manager or supervisor. Fearing occupied a relatively low position in the charged conspiracy. He was primarily a driver who retrieved marijuana for Gunderson and Hagen in Arizona and delivered it to their respective homes in Minnesota. He was also held at various times by marijuana suppliers in Arizona as "human collateral." At one point, Fearing moved to Arizona, where he continued to act as a courier for Gunderson. After the falling out between Gunderson and Hagen in 1997, Fearing continued to act as a courier, this time for Hagen.

In November of 1997, Fearing began a marijuana operation of his own, which he ran without the involvement of any of the principals of the charged conspiracy. Fearing's marijuana operation consisted of four occasions when Fearing provided financial backing and marijuana contacts to Wade Stafne for the transportation of marijuana from Arizona for distribution in Minnesota. While the PSR characterized this as "[Fearing's] own marijuana operation," it concluded that it was part of a "common scheme or plan" and part of the "same course of conduct" as the offense of conviction. Accordingly, because Fearing had supervised Stafne in this peripheral yet related marijuana operation, the PSR recommended a two-point increase in his base offense level under U.S.S.G. sec. 3B1.1(c) for his "role in the offense as an organizer, supervisor, or manager."

Fearing's counsel filed objections to the PSR's recommendation, contending that Fearing and Stafne were equal partners in their drug operation (i.e., that Fearing did not "supervise" Stafne), and that it was inappropriate for the court to apply the sec. 3B1.1 adjustment in any event since Fearing's alleged managerial role occurred outside of the conspiracy for which he was charged and convicted. At Fearing's sentencing hearing, his counsel expressly abandoned the first of these arguments, conceding that Fearing played a managerial role vis-a-vis Stafne in the separate marijuana operation, but he renewed his argument that sec. 3B1.1 should not apply because Fearing did not play a managerial role in the offense of conviction. The district court adopted the factual assertions of the PSR regarding Fearing's supervision of

Stafne, and applied the two-level increase under sec. 3B1.1(c) on that basis, finding that Fearing "used Mr. Stafne from time to time, providing him money as well as contacts," and "manag[ing] the way in which these trips would be conducted."

Fearing maintains that the district court erred in applying the sec. 3B1.1 adjustment, essentially repeating the argument that he made before the district court. He concedes that sec. 3B1.1 authorizes a district court to consider all relevant conduct when determining a defendant's role in the offense under that section. However, he argues that a court may consider relevant conduct for this purpose only insofar as it sheds light on the defendant's role in the offense of conviction. In other words, Fearing contends that a court may not simply import a defendant's managerial role in other relevant conduct to the offense of conviction (or conclude that he played a managerial role in the offense of conviction merely because he played such a role solely in other relevant conduct which is independent from the offense of conviction). Fearing notes that the expressed purpose of sec. 3B1.1 is to assess a defendant's responsibility for the offense relative to others involved in the offense, and he maintains that applying the enhancement strictly on the basis of a defendant's role in other relevant conduct leads to inequitable results which contravene this purpose. (For example, in this case, Fearing--who was merely a driver in the Hendricks/Hagen drug conspiracy--received a two-level enhancement under sec. 3B1.1, while Hendricks--a principal in the conspiracy--did not receive an enhancement.) Consequently, Fearing urges us to hold that evidence of a defendant's role in other relevant conduct supports an enhancement under sec. 3B1.1 only when that conduct is closely associated with (or "anchored to") the offense of conviction such that the defendant's role in the relevant conduct demonstrates a greater relative responsibility for the offense of conviction. Because Fearing's supervision of Stafne in the independent drug operation did not meet this standard, Fearing asks us to vacate his sentence and to remand for resentencing.

We are not persuaded. We review a

district court's finding that an enhancement under sec. 3B1.1 is warranted for clear error. See United States v. Billingsley, 115 F.3d 458, 464 (7th Cir. 1997). However, because Fearing has not challenged any of the factual findings which the district court made in support of its decision to apply the enhancement, and because his appeal is essentially an objection to the district court's interpretation and application of sec. 3B1.1(c), our review is de novo. See United States v. Johnson, 227 F.3d 807, 812 (7th Cir. 2000).

Section 3B1.1 provides for an increase in a defendant's offense level based upon his role in the "offense." The Sentencing Guidelines define "offense" as the offense of conviction plus all relevant conduct. See U.S.S.G. sec. 1B1.1, Application Note 1(l). The text of sec. 3B1.1 reinforces this definition of "offense" by stating, in the Introductory Commentary to Part B, that "[t]he determination of a defendant's role in the offense is to be made on the basis of all conduct within the scope of sec. 1B1.3 (Relevant Conduct), i.e., all conduct included under sec. 1B1.3(a)(1)-(4), and not solely on the basis of the elements and acts cited in the count of conviction." U.S.S.G. Ch. 3, Part B, Introductory Commentary. See also United States v. Baker, 227 F.3d 955, 966 (7th Cir. 2000). For offenses of a character for which sec. 3D1.2(d) would require grouping of multiple counts (such as the offense of conviction in Fearing's case), "relevant conduct" includes all acts or omissions that are part of the "same course of conduct" or "common scheme or plan" as the offense of conviction, regardless of whether the defendant was charged with or convicted of carrying out those acts. See U.S.S.G. sec. 1B1.3(a)(2); United States v. Mumford, 25 F.3d 461, 465 (7th Cir. 1994); United States v. Rivera, 6 F.3d 431, 445 (7th Cir. 1993). Pursuant to this provision, the PSR characterized Fearing's separate drug operation as "relevant conduct," and recommended the sec. 3B1.1 enhancement based upon his supervision of Stafne in that operation.

Fearing's own response to the PSR and to the government's position on this issue has doomed his argument. Fearing's counsel did not dispute that his drug

operation was "relevant conduct," and he expressly conceded that his direction of Stafne was the kind of activity that would qualify as "management" or "supervision" under sec. 3B1.1. Moreover, Fearing has not argued on appeal that the district court erred in finding that his drug operation with Stafne was relevant conduct or in holding him responsible for the drug amounts involved in that operation. Given this, his challenge to the application of the enhancement cannot stand. By conceding that he played a managerial role in relevant conduct, Fearing conceded that he played a managerial role in the "offense" as contemplated by sec. 3B1.1. Therefore, he conceded the applicability of the enhancement. Cf. United States v. Flores-Sandoval, 94 F.3d 346, 349-50 (7th Cir. 1996).

Fearing's contention that a defendant cannot receive an enhancement under sec. 3B1.1 strictly for performing a managerial role in relevant conduct (as opposed to the offense of conviction) contradicts the plain language of sec. 3B1.1, and has been rejected by each of the circuits which have addressed the question. For example, in United States v. Ocana, 204 F.3d 585, 591-92 (5th Cir. 2000), the court affirmed an upward adjustment of the defendant's sentence under sec. 3B1.1 based upon her managerial role in conduct which occurred after she was convicted of the drug conspiracy offense of conviction. Subsequent to her conviction for conspiracy to possess with intent to distribute marijuana, the defendant had recruited and hired others to transport marijuana to Florida. The court found the subsequent conduct to be part of the "same course of conduct" under sec. 1B1.3 (and therefore "relevant conduct") because it occurred regularly and within 7 months of the offense ofconviction, and it therefore affirmed the sec. 3B1.1 enhancement based upon her role in the subsequent conduct even though it involved different couriers, different drug sources, and a different modus operandi. The court ruled that conduct which is the basis for an upward adjustment under sec. 3B1.1 must be "anchored to the transaction," but it defined "transaction" broadly as including the post-conviction relevant conduct at issue. See also United States

v. Ushery, 968 F.2d 575, 582 (6th Cir. 1992) (ruling that a defendant's leadership role in a drug enterprise which was relevant conduct to the cocaine conspiracy of which he was convicted "mandated a two-point role in the offense enhancement under U.S.S.G. sec. 3B1.1 "). Cf. United States v. Lewis, 79 F.3d 688, 691-92 (7th Cir. 1996); United States v. Rosnow, 9 F.3d 728, 730-31 (8th Cir. 1993); United States v. Lillard, 929 F.2d 500, 502-03 (9th Cir. 1991).

In addition, we reject Fearing's contention that the expressed purpose of sec. 3B1.1 requires a different result.Fearing correctly notes that the purpose of sec. 3B1.1 is to assign punishment to defendants based upon their relative degree of responsibility for the "offense." However, this proposition aids Fearing's argument only if the term "offense" is construed narrowly as denoting only the offense of conviction, not including relevant conduct. Since we have rejected this construction of "offense," we must also reject Fearing's derivative argument from sec. 3B1.1's purpose. Because Fearing had a greater degree of responsibility than at least one other participant (Stafne) in an episode of concededly relevant conduct, he had greater relative responsibility in the "offense" as contemplated by sec. 3B1.1. Therefore, the application of the enhancement was entirely consistent with sec. 3B1.1's overarching purpose./1

One final point regarding Fearing's claim bears mentioning. It is true that a defendant's leadership role in "collateral conduct" will not justify an enhancement under sec. 3B1.1. See United States v. Sutera, 933 F.2d 641, 649 (8th Cir. 1991). However, "relevant conduct" by definition is not "collateral conduct." Unfortunately for Fearing, relevant conduct for the particular offense of which he was convicted is defined quite broadly to include not merely acts committed in furtherance of the crime, but also acts which merely bear a certain similarity to the crime (i.e., acts that are part of the "same course of conduct" as the offense of conviction). Nevertheless, not all criminal conduct will satisfy this criterion, and the government bears the burden of proving that the conduct at issue is relevant conduct and not purely collateral to the offense. To the extent

that the drug trips which Stafne made for Fearing were part of a truly separate and independent conspiracy, they might not fit the definition of "relevant conduct" under sec.1B1.3(a)(2)./2 However, Fearing has waived this argument by conceding before the district court that his drug operation with Stafne was relevant conduct and that the drug amounts from those trips should be included in his relevant conduct calculation, see United States v. Scanga, 225 F.3d 780, 783-84 (7th Cir. 2000); Flores-Sandoval, 94 F.3d at 349-50, and by not raising the issue on appeal.

D.  Bjorkman Issue

Bjorkman argues that the district court abused its discretion in denying his request for substitute counsel. On April 14, 1999, the district court appointed attorney Jack C. Hoag to represent Bjorkman, commencing what turned out to be a less than ideal attorney-client relationship. After a superceding indictment was filed and Bjorkman's trial date was set for June 28, 1999, Hoag filed an ex parte motion for leave to withdraw as Bjorkman's counsel. In the motion and in a supporting affidavit, Hoag stated that he had insufficient time to prepare for the pending trial and that he had not yet received "a substantial amount of information" which he needed to prepare Bjorkman's defense. As additional grounds for the motion, Hoag referred to Bjorkman's non-cooperation (including his refusal to comply with requests on a number of occasions), and to a "variety of ethical concerns" which he did not concretely identify or describe, but which he claimed "could significantly impair [his] ability to prepare and defend Mr. Bjorkman." The court took no action on this motion.

Four days after Hoag filed the motion, Bjorkman signed a plea agreement. During the plea hearing, the court twice asked Bjorkman whether he was "fully satisfied with the counsel, representation, and advice given to you by Mr. Hoag as your attorney in this matter." Both times, Bjorkman answered "yes." In addition, the court informed Bjorkman that the statutory minimum sentence for the charged offense was 5 years and the maximum was 40 years, based on a weight of marijuana that was more than 100 but

less than 1000 kilograms. Neither the parties nor the court indicated a probable guideline range, and the court informed Bjorkman that only the court would calculate his sentence under the guidelines and that it would do so only after the PSR had been completed and both sides had an opportunity to comment on it. The court cautioned Bjorkman not to rely on the possibility of receiving any particular sentence, reminding him that "any guideline computation discussions that your attorney may have had are not part of the plea agreement." Bjorkman indicated that he understood each of these facts. Also, the court asked Bjorkman whether he believed that the plea agreement represented the "entire, full and complete . . . agreement that you have with the United States." After Bjorkman responded affirmatively, the court asked him if anyone had made "any other different promise or assurance to you of any kind in an effort to induce you to enter a plea of guilty in this matter." Bjorkman said "no." After hearing the government's factual proffer in support of Bjorkman's guilty plea, the court accepted and entered the plea, set a sentencing date for August 25, 1999, and ordered preparation of the PSR by July 26.

On July 30, 1999, Bjorkman wrote a letter to the court requesting substitute counsel. In the letter, Bjorkman complained that Hoag had "withheld valuable information" from him in connection with the plea agreement by erroneously advising him that he would be classified as a career offender and sentenced under the career offender guidelines. Bjorkman maintained that "[t]his information had a direct baring [sic] on my guilty plea." Bjorkman claimed to have discovered the inaccuracy of Hoag's advice while speaking with the probation officer after the PSR was prepared. Bjorkman further complained that Hoag had "ceased all contact" with him and not made himself available for consultation after the entry of the guilty plea. (Bjorkman stated that before the guilty plea, he and Hoag had had "a minimum of weekly contact.") Neither the court nor Hoag took any action on Bjorkman's request until the August 25, 1999 sentencing hearing.

At the sentencing hearing, the court

asked Bjorkman if he had read the PSR, the addendum, and the related documents, including objections to the PSR which Hoag had filed on Bjorkman's behalf on August 6, 1999. Bjorkman responded that he had read these documents, but had not discussed them with his attorney. At this point, Hoag reminded the court of Bjorkman's letter requesting substitute counsel, and the court immediately convened an ex parte hearing to consider Bjorkman's request. During the hearing, Hoag stated that his communication with Bjorkman was "virtually nonexistent at this point," and opined that Bjorkman would be better served with a new counsel, "to explore a variety of options for him." Hoag urged the court to appoint new counsel "given the communication between the parties." The court turned to Bjorkman and asked him for "those comments which you wish to make." In response, Bjorkman simply repeated that he would like a new attorney. The court retorted that "you don't change attorneys like you do socks, Mr. Bjorkman." The court then indicated that it had received Bjorkman's letter of July 30, and summarized the concerns that Bjorkman had expressed in the letter regarding Hoag's unavailability after the guilty plea and his "withholding of valuable information." The court rejected the former concern, concluding that Hoag's preparation of objections to the PSR evidenced that Bjorkman and Hoag must have had some extended communications after the guilty plea. Moreover, the court dismissed Bjorkman's claim that he entered his guilty plea without full knowledge of his potential exposure under the guidelines, reminding Bjorkman that the court told him during the plea hearing that the applicable guideline range could not be determined until after the PSR was prepared, and that he should not rely on his attorney's guideline calculations in entering the plea. The court then stated that Bjorkman's request was denied.

Bjorkman immediately objected, and the court initially responded that Bjorkman had not given it any additional reasons to grant the request, and that he had remained silent when the court asked for his input. Nevertheless, the court then allowed Bjorkman to air further grievances about Hoag. Bjorkman complained of a litany of claimed errors

and shortcomings on Hoag's part. For example, Bjorkman claimed that Hoag had done no work on the case, had constantly implored him to plead guilty (threatening to withdraw if he insisted on going to trial), and had wanted Bjorkman to agree to marijuana amounts that Bjorkman did not think were accurate, assuring him that the amounts would not effect his exposure. Bjorkman concluded by saying "I want a new attorney. It's up to my new attorney to decide if I can change my plea or not. I don't know. I'm not--I'm not saying I want to change my plea. That would be up to my new attorney." Repeating its conclusion that Bjorkman was adequately warned that any guideline calculations made by the parties before the entry of the plea were not part of the plea agreement, the court denied Bjorkman's request for substitute counsel.

The court then granted a temporary recess, and ordered Bjorkman and Hoag to discuss the PSR and the related materials and to inform the court when they were ready to proceed. The court proclaimed that, in any event, the sentencing hearing would take place that afternoon. Bjorkman and Hoag conferred for approximately 35 minutes, after which the sentencing hearing was reconvened. Bjorkman informed the court that he had read all of the sentencing documents and discussed them with Hoag. Hoag then outlined the arguments that he planned to make on Bjorkman's behalf, including objections to the PSR's calculations as to drug amounts included as relevant conduct, and various other arguments. Bjorkman acknowledged that he understood these challenges and indicated that there were no others that he wished to raise aside from those outlined in his written objections to the PSR. A full sentencing hearing was then conducted, during which the government put on three witnesses, and Bjorkman and his wife testified on his behalf.

If the defendant has been given an opportunity to explain to the court the reasons behind his request for substitute counsel, we review the denial of that request only for an abuse of discretion. See United States v. Golden, 102 F.3d 936, 940 (7th Cir. 1996). Here, the district court conducted an ex parte hearing to address Bjorkman's concerns

regarding Hoag, during which Bjorkman was given an opportunity to discuss each of his reasons for seeking substitute counsel. See id. at 940-41. Therefore, our review is for abuse of discretion.

In determining whether the district court abused its discretion in denying a motion for substitute counsel, we consider the following three non-exhaustive factors: (1) the timeliness of the motion; (2) the adequacy of the court's inquiry into the defendant's motion; (3) whether the conflict was so great that it resulted in a total lack of communication preventing an adequate defense. See id. at 941; United States v. Zillges, 978 F.2d 369, 372 (7th Cir. 1992). If we find an abuse of discretion, we will nevertheless uphold the district court's decision unless the defendant establishes that he was deprived of his Sixth Amendment right to effective assistance of counsel. See Zillges, 978 F.2d at 372-73. Bjorkman sent a letter to the court requesting substitute counsel after he pled guilty, approximately three weeks before the scheduled sentencing hearing. We have held that a defendant's request for substitute counsel was untimely where the court received the defendant's letter after the defendant had formally pled guilty and ten days before the sentencing hearing. See United States v. Hall, 35 F.3d 310, 313-14 (7th Cir. 1994) (affirming the district court's finding that "[the defendant's] efforts here appear to the court to be an effort to derail the sentencing that was fast approaching at the time he sent this letter."). Bjorkman's case is somewhat distinguishable from Hall, however, in that the asserted grounds for Bjorkman's request concerned conduct by his attorney which either occurred after the plea hearing or which (he argues) could not reasonably have been discovered before the PSR was completed, and he made his request immediately after reviewing the newly composed PSR. Nevertheless, it is not clear whether these facts will suffice to make Bjorkman's request for substitution of counsel timely, given that we have never found such a request timely when it was made after the entry of a guilty plea and shortly before sentencing, and given that we rejected Hall's request as untimely when at least one of his grievances involved the manner in which the PSR was prepared. See Hall,

35 F.3d at 312-14.

However, we need not decide this close question, because even if we were to find Bjorkman's request timely, a consideration of the remaining two factors convinces us that the district court did not abuse its discretion in denying it. First, the district court's inquiry into Bjorkman's motion was adequate. Before conducting a hearing on the matter, the district court had received and read Bjorkman's letter which expressed his grievances concerning Hoag in some detail. Thus even without the hearing the court may well have been sufficiently apprised of the nature of Bjorkman's complaints to rule on his request. See Hall, 35 F.3d at 313. Regardless, the ex parte hearing removes any doubt on the matter. After hearing Hoag's views on the issue, the court asked Bjorkman for "those comments which you wish to make." Bjorkman initially declined to add anything of substance, but when he objected to the district court's initial denial of his request, the court gave him another opportunity to speak. Bjorkman then spoke at length, fully expressing each of his concerns regarding Hoag's representation. The court did not interrupt Bjorkman at any point, and when he finished the court asked him if had anything further to say, proceeding to address the merits of Bjorkman's request only after Bjorkman said that he did not. The court's subsequent analysis reveals that it listened to Bjorkman's concerns, and responded thoughtfully and appropriately. In short, the court "engage[d] in an inquiry as to the reasons for the defendant's dissatisfaction with his attorney," see Zillges, 978 F.2d at 372 (quotation and citation omitted), and it did not merely seek either to "elicit a general expression of satisfaction," see id., or to dismiss the matter in a conclusory fashion.

In addition, the record supports the district court's conclusion that Bjorkman and Hoag's relationship had not deteriorated to the point that there was a "total lack of communication preventing an adequate defense." See Hall, 35 F.3d at 314. By the time of the ex parte hearing, Hoag had prepared and filed extensive objections to several of the PSR's sentencing recommendations. The

court quite reasonably took this as strong evidence that, notwithstanding their protestations to the contrary, Bjorkman and Hoag were able to communicate sufficiently to present an adequate defense, even after the plea hearing. Also, during the plea hearing, Bjorkman stated under oath that he was fully satisfied with Hoag's representation, belying his subsequent claims that Hoag did nothing to prepare from the start of the case. Finally, after the court denied Bjorkman's request and ordered him to discuss the sentencing documents with Hoag, Bjorkman apparently had little difficulty communicating with Hoag. The two discussed the documents and returned to the courtroom, whereupon Bjorkman stated that he had discussed the documents with Hoag and assented to Hoag's characterization of the challenges that he would be raising to the PSR. Hoag proceeded to conduct a vigorous sentencing presentation on Bjorkman's behalf, examining witnesses and cross-examining the government's witnesses. See United States v. Brown, 79 F.3d 1499, 1507 (7th Cir. 1996). Neither Hoag nor Bjorkman complained further regarding their claimed inability to communicate.

Bjorkman asserts that none of this matters, because the complaint that he raised during the ex parte hearing had nothing to do with Hoag's ability to conduct an adequate defense during the sentencing phase; rather, he objected that the bad advice that Hoag had given him regarding the relative benefits of pleading guilty versus going to trialrendered Hoag unable to counsel him effectively regarding the possibility of withdrawing his guilty plea./3 Bjorkman claimed that Hoag had told him that he stood exposed to much higher penalties than later suggested by the PSR, and that he pleaded guilty to minimize losses grossly overestimated by his attorney. Bjorkman correctly notes that an attorney's errors in describing the consequences of conviction might justify the withdrawal of a guilty plea based upon the erroneous advice. See United States v. Teller, 762 F.2d 569, 578 (7th Cir. 1985) (citing Hammond v. United States, 528 F.2d 15, 18-19 (4th Cir. 1975) (holding that a defendant's guilty plea was involuntary where his counsel erroneously advised him that if he did not plead he could be sentenced to a

maximum 90-95 year sentence, when the law actually prescribed a maximum of only 55 years)); Cooks v. United States, 461 F.2d 530, 532 (5th Cir. 1972) (vacating a defendant's plea based on his counsel's "patently erroneous" advice that if he did not plead he would be subject to a sentence six times more severe than the law actually allowed). Further, Bjorkman notes that a motion to withdraw his plea would be based on the argument that Hoag rendered ineffective assistance in overstating his exposure, and therefore that Hoag could not possibly provide effective, conflict-free advice regarding whether or not such a motion should be made. Therefore, Bjorkman argues that there was a conflict between he and Hoag which interfered with his ability to conduct a defense, wholly apart from Hoag's ability to mount a competent challenge to the government's sentencing arguments. Under these circumstances, Hoag argues that the district court abused its discretion in denying his request for a substitute counsel to help him evaluate his options.

We are not persuaded. First, Bjorkman did not move to vacate his plea, nor did he even argue that he would not have pled guilty if it were not for Hoag's erroneous advice. (Indeed, he did not even tell the district court what Hoag told him regarding his exposure; he merely said that Hoag had erroneously told him that he would be sentenced as a career offender, and that this had a "direct bearing" on his guilty plea). Further, although he claimed that Hoag misinformed him, Bjorkman did not claim that Hoag had failed to render good-faith advice regarding his exposure. Therefore, based upon the information he presented to the district court, Bjorkman could not establish that he had a non-frivolous claim for the withdrawal of his plea based upon ineffective assistance of counsel. See Bridgeman v. United States, 229 F.3d 589, 592 (7th Cir. 2000) (ruling that "to demonstrate prejudice arising from a guilty plea allegedly rendered involuntary by counsel's deficient performance, a petitioner must establish that counsel's performance was objectively unreasonable and that, but for counsel's erroneous advice, he would not have pleaded guilty."); Gargano v. United States, 852 F.2d 886, 891 (7th Cir. 1998) (holding that defendant failed

to establish prejudice when he failed to claim that he would have pleaded differently and insisted on going to trial but for his counsel's bad advice); United States v. Barnes, 83 F.3d 934, 939-40 (7th Cir. 1996) (holding that counsel was not ineffective in advising defendant about the consequences of pleading guilty, despite failing to recognize that the defendant would be sentenced as a career offender under the guidelines, where nothing in the trial record proved that he did not undertake a good-faith investigation of the facts relevant to the defendant's sentencing). Moreover, regardless of what Hoag may have told Bjorkman before the plea, Bjorkman was told both in the plea agreement and by the district court during the plea colloquy that the statutory maximum for the charged offense was 40 years. The fact that Bjorkman neither refused to enter his plea nor voiced any objection when confronted with this information precludes him from arguing that he pled guilty in reliance upon some alternative characterization of his exposure given to him by his counsel. Cf. United States v. Martinez, III, 169 F.3d 1049, 1053-54 (7th Cir. 1999); United States v. Rice, 116 F.3d 267, 268-69 (7th Cir. 1997); United States v. Westcott, 159 F.3d 107, 112-114 (2d Cir. 1998). Further, in response to the court's questions during the plea colloquy, Bjorkman indicated under oath that he understood that his lawyer's guideline predictions were not part of the plea agreement, and that the district court (and only the district court) would determine the applicable guideline range after the PSR was prepared. While these questions were meant to inform Bjorkman of the consequences of pleading guilty (as opposed to the consequences of being convicted after going to trial), they should have put him on notice of the fact that predicting the guideline range under which he would be sentenced is an uncertain art, and that no guideline prediction by his attorney was ironclad. Cf. Barnes, 83 F.3d at 940. This conclusion is reinforced by Bjorkman's statement under oath that no one had made any promises or assurances to induce him to plead guilty. Given the limited information presented to it on this issue, the district court did not abuse its discretion in refusing to credit the theory that Hoag's error induced Bjorkman

to plead guilty, creating a conflict which rendered Hoag incapable of presenting an adequate defense. Therefore, we affirm the court's denial of Bjorkman's request.

CONCLUSION

We have considered the other arguments raised by each of the appellants and find them meritless. Therefore we AFFIRM the appellants' sentences, the denial of Bjorkman's motion for substitution of counsel, and the fine imposed on Hagen.

FOOTNOTES

/1 We also reject Fearing's contention that because Hendricks--a "bigger fish" in the offense of conviction--did not receive an enhancement under sec. 3B1.1, it was inappropriate for Fearing to have received one. We have ruled repeatedly that if a court sentences a defendant in accordance with the guidelines, "we will not disturb [the] sentence because another defendant was treated differently." United States v. McClinton, 135 F.3d 1178, 1192 (7th Cir. 1998).

/2 Without deciding the matter, we note that this conclusion strikes us as rather unlikely, given that this "independent" drug operation occurred while the conspiracy of conviction was ongoing, and that it involved two members of that conspiracy acquiring marijuana from the same drug sources and transporting it to the same location via a similar modus operandi. Thus it fits the definition of "same course of conduct" more readily than does the Ocana defendant's post-conviction conduct.

/3 Bjorkman also argues that Hoag rendered prejudicial ineffective assistance by failing to argue that the weight of marijuana for which Bjorkman was to be held responsible was an element of the offense which must be alleged in the indictment, and that a sentence may be imposed only for the crime alleged in the indictment (and by failing to press for a lower sentence given the omission of this information from the indictment). However, as Bjorkman did not raise this argument before the district court during the ex parte hearing, we cannot address it here.