UNITED STATES of America,
Plaintiff–Appellee,

v.

Anthony GAINES, Defendant–Appellant.

No. 92–2383.

United States Court of Appeals,
Seventh Circuit.

Argued June 3, 1992.

Decided Oct. 7, 1993.

Philip A. Guentert (argued), Office of the U.S. Atty., Crim. Div., Chicago, IL, Barry R. Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

Kathleen T. Zellner, Michael Hemstreet, Douglas Johnson, Zellner & Associates, Naperville, IL, for defendant-appellant.

Before BAUER, CUDAHY and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

Anthony Gaines was convicted and sentenced for conspiring to possess with intent to distribute LSD, in violation of 21 U.S.C. § 841(a)(1). Gaines appeals the sentence, contesting the district court's computation of the amount of LSD involved, and the court's decision not to depart downward. We affirm the district court's calculation of the weight of the LSD, and dismiss for lack of jurisdiction the appeal of the district court's refusal to depart downward.

## I

On July 31, 1991, Anthony Gaines, Timothy Dalmasso and a seventeen-year-old woman were arrested and found to possess sheets of perforated "blotter paper" containing 1075 doses of lysergic acid diethylamide (LSD). The combined weight of the paper and the LSD was 8.2 grams. Gaines and Dalmasso were subsequently indicted for (1) conspiring to distribute and to possess with the intent to distribute 8.2 grams of LSD and (2) possession with the intent to distribute the 8.2 grams of LSD.

On March 2, 1992, Gaines pleaded guilty to Count I of the indictment and agreed to cooperate in exchange for a 25 percent departure from the applicable sentencing guideline range. Gaines admitted that a week prior to the arrest, he had sold 1.0 gram of LSD to Daniel Simon, an individual who, unbeknownst to Gaines and Dalmasso, was cooperating with law enforcement authorities. Gaines acknowledged that, when he was arrested on July 31, he was in the process of consummating a sale of 1000 doses to Simon. Gaines also admitted that he had

promised Simon that he would return with another 1000 doses for Simon in a later trip, and that he had previously sold 9.2 grams of LSD on three different occasions during the course of the charged conspiracy. According to the Sentencing Guidelines, the base offense level for possession of between seven and ten grams of LSD is 30. U.S.S.G. § 2D1.1(c)(7). Thus, the plea agreement stated that the base level for the offense would not be less than 30, although the government reserved the right to present evidence that additional quantities of LSD should be considered.

On June 3, 1992, at Gaines' sentencing hearing, Simon testified that Gaines had sold him LSD on 10 to 15 different occasions. The LSD was sold on "sheets" containing 100 doses, and Simon testified that on each of these occasions he purchased between two and ten sheets. Simon further testified that the prices of the sheets ranged from $225 to $300 per sheet.

After reviewing all of the evidence, the district court found that, for the purposes of sentencing, the defendant was responsible for distributing a minimum of 4500 doses of LSD. Because the Federal Sentencing Guidelines measure the amount of LSD by weight and not by number of doses, however, the district court was required to calculate the weight of the 4500 doses. Since the actual weight of most of the LSD was unknown, the court concluded that the average unit weight of the recovered LSD should be used to compute the weight of the unrecovered LSD. The 1075 doses recovered from the defendants had weighed 8.2 grams, yielding an average unit weight of .007 grams per dose. By multiplying .007 grams by 4500 doses, the court determined that the LSD involved in the distribution weighed 31.5 grams. The court then added this to the 9.2 grams to which the parties had stipulated in the plea agreement and concluded that Gaines was responsible for the sale and distribution of 40.7 grams of LSD.[1] This placed

the defendant's offense level at 34. The court also determined that, while Gaines was entitled to a two level reduction for acceptance of responsibility, an additional downward departure for "youthful lack of guidance" was not warranted. The court did, however, reduce Gaines' sentence by 25 percent on the basis of his substantial cooperation with the government. Gaines was then sentenced to a term of 91 months imprisonment and five years supervised release.

Gaines appeals his sentence on two grounds, claiming (1) that in determining the weight of the extra 4500 doses of LSD, the court should have used the "Typical Weight Per Unit Table" in note 11 of the commentary following Sentencing Guideline § 2D1.1, and not the average weight of the 1075 recovered doses, and (2) that the district court committed error when it refused to depart downward from the applicable guideline range based on the lack of guidance that Gaines received as a youth.

## II

We review the district court's interpretation of the Guidelines *de novo* and its finding with respect to the quantity of drugs involved for clear error. *United States v. Sanchez*, 984 F.2d 769, 774 (7th Cir.1993).

Gaines argues that the methodology that the district court used when it determined the weight of the 4500 unrecovered doses was improper. He contends that rather than extrapolate the weight of the unrecovered doses based on the weight of the recovered doses, the court should have used the Guidelines' "Typical Weight Per Unit Table." Although the table appears in the commentary portion of the guidelines, it nonetheless is controlling law. *See Stinson v. United States*, —— U.S. ——, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993). Thus, Gaines' argument that the district court should have simply applied the Guidelines' Typical Weight Table has at least superficial appeal.[2]

---

1. The district court did not factor into the equation the 1000 doses Gaines promised to deliver to Simon on the second trip because the addition of these doses would not have altered Gaines' base offense level.

2. The government asserts that Gaines has waived this argument, since he did not previously object to the methodology used to determine the unit weight per dose. The government's argument is without merit, however, since in his "Position

In order to understand the import of Gaines' argument, it is necessary to examine what the result would have been had the district court used Gaines' suggested methodology. The "Typical Weight Per Unit Table" is located in note 11 of the commentary to § 2D1.1. Note 11 provides:

> If the number of doses, pills, or capsules but not the weight of the controlled substance is known, multiply the number of doses, pills, or capsules by the typical weight per dose in the table below to estimate the total weight of the controlled substance. The Typical Weight Per Unit Table, prepared from information provided by the Drug Enforcement Administration, displays the typical weight per dose, pill, or capsule for certain controlled substances. Do not use this table if any more reliable estimate of the total weight is available from case specific information.

The typical weight provided for LSD is .05 milligrams per dose. Thus, had the district court used the table to calculate the weight of the 4500 unrecovered doses, the total weight would have been .225 grams. Adding this amount to the 9.2 grams to which the parties have stipulated would yield a total weight of 9.425 grams of LSD. The defendant's base offense level would on that basis be 30.[3]

At first blush, this seems to be an odd result. The average weight of each recovered dose of LSD was .007 grams—approximately 100 times greater than the .05 milligrams (.00005 grams) provided in the Typical Weight Table. This seemingly anomalous result stems from the fact that the Typical Weight Table estimates the amount of actual liquid LSD per dose, and does not include, as the Guideline calculation for LSD generally does, the weight of the carrier medium in its estimate. *See Chapman v. United States,* —— U.S. ——, 111 S.Ct. 1919, 114 L.Ed.2d

524 (1991). Thus, the Typical Weight Table does not provide "typical" weights, since LSD is regularly sold in or on some form of medium. *Id.* The comment to this section acknowledges the shortcomings of the weight table: "For controlled substances marked with an asterisk (including LSD), the weight per unit shown is the weight of the actual controlled substance, and not generally the weight of the mixture or substance containing the controlled substance. Therefore, use of this table provides a very conservative estimate of the total weight." U.S.S.G. § 2D1.1, comment. (n. 11).

■ In the present case, however, reliance on the table is not necessary because there is clearly a "more reliable estimate of the total weight" which can be gleaned from "case specific information." Since LSD is regularly sold in or on a carrier medium—be it blotter paper, sugar cubes or gelatin capsules—the weight of the carrier medium effectively controls the weight of the LSD for sentencing purposes. *Chapman,* —— U.S. at ——, 111 S.Ct. at 1925. Thus, virtually any evidence of the weight of the medium carrying the LSD is more "reliable" than the weight of the drug alone. *See United States v. Martz,* 964 F.2d 787, 790 (8th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 823, 121 L.Ed.2d 694 (1992).

*United States v. Martz* squarely addresses the point at issue here. In *Martz,* the defendant was charged with distribution of 33,800 doses of LSD, although the actual weight of only 1800 doses was known. *Id.* In order to determine the total weight of the 33,800 doses for which the defendant was to be held responsible, the district court attributed the lightest known weight of the 1800 doses to all of the dosage units. On appeal, the Eighth Circuit held that this was an appropriate approach. Even though the blotter paper in the representative sample did not come from

---

Paper as to Sentencing Factors," Gaines specifically contested the government's position that the 4500 unrecovered doses had the same weight as the recovered doses. Although Gaines did not direct the district court to the Typical Weight Table, neither did he accept the court's proposed methodology. Thus, we conclude that he did not waive the issue.

3. Gaines acknowledges that if we decide to use his methodology, the second 1000 doses, which he proposed to bring on later trip, must be added to the total weight of the LSD for which he is responsible. Once again, however, these 1000 doses do not alter the outcome—for adding this amount would yield a total weight of 9.475 grams, which would not affect Gaines' base offense level.

the "same source at the same time" as the other 32,000 doses, there was enough "case specific evidence" to estimate the total weight by extrapolating the lightest known weight over all of the doses. *Id.*

Gaines attempts to distinguish his case from *Martz* in two ways. First, he notes that in *Martz,* the LSD was delivered in two batches, while here it was delivered in ten to fifteen batches. Second, he points out that in *Martz,* the representative samples were taken from each batch, whereas in his case, the representative 1075 doses were not taken from the unrecovered 4500 doses.

We do not believe that these distinctions necessarily impugn the reliability of the case specific information. There is ample evidence supporting the district court's finding that all of the doses were uniform in weight. All of the LSD involved (the 4500 doses and the 1075 doses to which the parties stipulated) was sold by the defendant to the same person, Daniel Simon. All of the LSD was distributed by way of the same carrier medium—on sheets of blotter paper. Moreover, there is evidence that all the LSD came from the same supplier. Although it is true that the price varied from transaction to transaction (the sheets varied in price from $225 to $300 each) and that this might be explained by a variance in the per dose weight, there are also other, more reasonable explanations to justify the incongruity in prices. For example, the costs of LSD production might vary from transaction to transaction, and there is no reason to think that supply and demand may not cause the price of LSD to fluctuate even on a short-term basis.

In any event, the amount of LSD in any dose is minuscule. The difference in weight is largely attributable to a difference in the size or type of medium. No rational purchaser of LSD (whose existence we will postulate for this purpose) would presumably pay any more or any less for the product based on the type or amount of carrier medium. It is therefore reasonable to infer that the difference in price had no bearing on the carrier medium employed and by the same token the weight of the LSD for sentencing purposes. Further, even if the per dose weight was not *uniform,* the district court's approximation, since it was based on the per dose weight of the recovered doses of LSD on blotter paper, is very probably a "more reliable estimate" than that of the Typical Weight Table, which weighs the LSD without the carrier medium. *See Martz,* 964 F.2d at 790; *United States v. Bishop,* 894 F.2d 981 (8th Cir.), *cert. denied sub nom., Ayers v. United States,* 498 U.S. 836, 111 S.Ct. 106, 112 L.Ed.2d 77 (1991).

■ Gaines also argues that the district court erred by refusing to depart downward from the applicable guidelines range based on Gaines' lack of guidance as a youth. Although the current formulation of the Guidelines expressly prohibits downward departures for youthful lack of guidance,[4] the Guidelines were silent on this issue when Gaines was sentenced. Thus, at the time of sentencing, the district court presumably had discretion to consider such a factor when deciding whether to depart downward.

■ However, since a decision to depart is wholly within the discretion of the district court, there is no appellate remedy available if a district court chooses not to depart. *See United States v. Helton,* 975 F.2d 430, 434 (7th Cir.1992); *United States v. Franz,* 886 F.2d 973, 978 (7th Cir.1989). On the other hand, if a decision not to depart is the product of an erroneous belief that the judge lacked the authority to depart, it is reviewable on appeal. *United States v. Poff,* 926 F.2d 588, 591 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 96, 116 L.Ed.2d 67 (1991).

Gaines has presented no evidence to support his contention that the district court's decision not to depart was based on anything but the merits of his case. Gaines specifically informed the district court of its discretion to depart downward. In his "Position Paper

---

4. U.S.S.G. § 5H1.12 (November 1, 1992) provides:

*Lack of Guidance as a Youth and Similar Circumstances*

Lack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing are not relevant grounds for imposing a sentence outside the applicable guideline range.

As To Sentencing Factors," Gaines cited the relevant authority, *United States v. Floyd,* 945 F.2d 1096 (9th Cir.1991) (holding that downward departure for "youthful lack of guidance" is appropriate and within the district court's discretion), and requested that the court exercise its discretion and depart downward. Although the court considered itself "limited by the guidelines," it clearly understood that a decision to depart downward was within its discretion. Since the court knowingly exercised its discretion and declined to depart from the guideline range, we have no jurisdiction to review that decision and we therefore must dismiss Gaines' claim.

### III

For the foregoing reasons, the sentence of the district court is

AFFIRMED.