UNITED STATES of America,
Plaintiff–Appellee,

v.

Farod LEWIS, Defendant–Appellant.

No. 94–3140.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 30, 1995.

Decided March 28, 1996.

Zaldwaynaka Scott (argued) and Barry Rand Elden, Chief of Appeals, Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

Joseph R. Lopez (argued), Chicago, IL, for Defendant–Appellant.

Before CUMMINGS, RIPPLE, and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Farod Lewis was charged in a multi-count second superseding indictment with various drug offenses, a firearms offense, money laundering offenses, and obstruction of justice. Lewis subsequently pled guilty to the indictment's first count, which addressed his participation in a cocaine distribution conspiracy between 1986 and late December 1991. In exchange for Lewis' plea, the government agreed to dismiss the indictment's remaining counts, all but one of which addressed acts that were alleged to be in furtherance of the narcotics distribution conspiracy. The district court then sentenced Lewis to a prison term of 188 months. In this appeal, Lewis raises three challenges to that sentence, but we find no error and therefore affirm.

I.

■ Lewis first contends that the district court erred in adding two points to his base offense level under Sentencing Guidelines section 2D1.1(b)(1) after finding that both he and a co-conspirator had possessed dangerous weapons during the commission of a narcotics offense. The district court applied the enhancement after hearing testimony from an undercover DEA agent and a confidential informant that Lewis and a co-conspirator each had possessed a firearm during the course of an October 3, 1991 cocaine transaction. The district court found that despite certain discrepancies brought out on cross-examination, the two witnesses had tes-

tified truthfully about the presence of these weapons. (R. 219, at 80–82.) In contesting this conclusion, Lewis argues that the government failed to prove by a preponderance of the evidence that any firearms were present. We review the district court's application of the firearm enhancement under section 2D1.1(b)(1) for clear error. *United States v. Jones,* 54 F.3d 1285, 1294 (7th Cir.), *cert. denied,* — U.S. ——, 116 S.Ct. 263, 133 L.Ed.2d 186 (1995); *United States v. Montgomery,* 14 F.3d 1189, 1199 (7th Cir.1994).

The October 3, 1991 cocaine transaction was alleged by the government to have been undertaken in furtherance of the cocaine distribution conspiracy to which Lewis admitted his guilt. Although Lewis reserved his right to contest application of the firearm enhancement at sentencing, he admitted the following facts about the October 3, 1991 transaction in his plea agreement:

[O]n or about October 3, 1991, an individual named Lawrence Strickland arranged to sell a ¼ kilogram of cocaine for a purchase price of $6,000, to two confidential informants ("the CIs") and a DEA Special Agent who was acting in an undercover capacity ("undercover agent"). On that day, the CIs and the undercover agent met with Strickland at Strickland's residence located at 6628 South Winchester, Chicago, Illinois. Defendant was waiting outside of the residence when the undercover agent and the two CIs arrived. Defendant had a firearm in his possession and displayed the firearm to the CIs and the undercover agent. While defendant remained outside the residence, the two CIs entered Strickland's residence and met with Strickland and another individual. Strickland delivered approximately 248 grams of cocaine to the CIs in exchange for $6,000 in cash. The other individual inside the residence had a firearm with him at the time of the purchase of the cocaine.

(R. 180, at 4.)

At the sentencing hearing, moreover, the government presented the testimony of two participants in the October 3, 1991 transaction—DEA Agent Antonio Smith and confidential informant Clarence Glenn. Smith

first explained that after he and the confidential informants arrived at the Strickland residence on October 3, Lewis approached the driver's side of their vehicle, where Smith was seated. Lewis had his arms folded across his chest, and when he was within two feet of the vehicle, he leaned toward the driver's side window, allowing Smith to see a semiautomatic weapon hidden under Lewis' left armpit. Glenn, who was in the back seat, also saw the weapon when Lewis leaned over. Indeed, Glenn had first seen the firearm shortly after Lewis' arrival on the scene. Glenn testified that Lewis came to Strickland's residence with a second individual in a black BMW. Lewis exited from the passenger side and spoke to Strickland, who was standing on the porch. At the same time, Lewis reached behind him and pulled a "nine millimeter Glock" from the back of his pants. According to Glenn, Lewis removed the weapon from his pants with his right hand and stuck the weapon under his left armpit as he approached the driver's side of Smith's car. Lewis then leaned toward the driver's side window, and Glenn again saw the firearm under Lewis' left armpit. In addition, Glenn testified that he later went into Strickland's residence to complete the transaction and that he and the other informant found themselves in the kitchen with Strickland and another individual. Lewis and Smith remained outside. Glenn indicated that during this meeting in the kitchen, Strickland's companion was holding a .38 caliber revolver. The only other evidence addressed to the firearm enhancement came in the form of a stipulation that Anthony Price, who had been charged as one of Lewis' co-conspirators, would testify that he had been present during the October 3, 1991 transaction and that he had not seen Lewis with a firearm.

■ Needless to say, Lewis' admissions in the plea agreement and the testimony of Smith and Glenn at the sentencing hearing provide an adequate evidentiary basis for application of the section 2D1.1(b)(1) enhancement. To accept Lewis' argument, we would be required to disregard his own admissions in the plea agreement, as well as the district court's express finding at sentencing that Smith and Glenn had testified credibly. We can do neither on this record.

There was no clear error in the district court's application of the firearm enhancement under section 2D1.1(b)(1).

## II.

■ Lewis next maintains that the district court erred in finding that he was an organizer, leader, manager, or supervisor of criminal activity under section 3B1.1(c). The court found that although Lewis may not have held a supervisory role over the others involved in the October 3, 1991 cocaine transaction, he had supervised members of his own family who were involved in the money laundering activities. Counts five through ten of the indictment addressed Lewis' use of relatives and friends to launder the proceeds derived from his role in the narcotics distribution conspiracy. Those money laundering activities were also alleged in count one as acts committed in furtherance of the cocaine distribution conspiracy. The district court found that Lewis' own admissions in his plea agreement and other information contained in the presentence report established that Lewis at least was an organizer, leader, manager, or supervisor in that laundering activity under section 3B1.1(c). (R. 219, at 94–95.) We review the district court's finding as to Lewis' aggravated role for clear error. *United States v. Johnson–Dix*, 54 F.3d 1295, 1309 (7th Cir.1995); *United States v. Billops*, 43 F.3d 281, 287 (7th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1389, 131 L.Ed.2d 241 (1995).

■ Count five charged a conspiracy between Lewis, his mother Harriette Beverly, his brother Augie Lewis, and his brother-in-law Reginald Searcy to obstruct and impede the Internal Revenue Service and the Drug Enforcement Administration from carrying out their lawful functions. That count detailed the steps Lewis had taken to conceal the proceeds of his narcotics trafficking. For example, the government alleged that Lewis had directed his brother to file a federal tax return detailing a purported interest in real estate that Lewis himself owned, and that he had directed Searcy to execute documents for the purchase of an automobile when Lewis was the actual purchaser.

Counts six through ten addressed the structured purchase of cashier's checks by Lewis and others acting on his behalf and the subsequent use of those checks to purchase real estate and personal property. Because these money laundering activities were alleged as acts in furtherance of the narcotics distribution conspiracy charged by the government in count one, Lewis acknowledged the following facts about that activity in his plea agreement:

> [D]uring the period of the charged narcotics conspiracy, defendant made a substantial amount of cash from the sale and distribution of cocaine. Defendant attempted to conceal his acquisition and expenditure of his cocaine proceeds from the Internal Revenue Service, the Drug Enforcement Administration and other law enforcement agencies by acts which included: structuring or causing the structured purchase of cashier's checks and money orders used to acquire assets such as real estate, using nominees to purchase cashier's checks and money orders in amounts under $10,000, and placing the title to assets defendant purchased in the names of nominees, as described in Counts Five through Ten of the second superseding indictment. Specifically, defendant had various relatives and friends perform acts designed to conceal the source and expenditure of his narcotics trafficking proceeds. These relatives and friends included his mother, Harriette Beverly, his brother, Augie Lewis and his brother-in-law, Reginald Searcy. On behalf of the defendant and with cash supplied by the defendant, these relatives and friends purchased cashier's checks and money orders, and made deposits and payments on assets acquired by defendant.

(R. 180, at 5.) The presentence report included additional information which suggested that Lewis had directed the other participants in these money laundering activities. Lewis, meanwhile, offered no evidence to explain his admissions in the plea agreement. As a result, we cannot accept Lewis' contention that there was insufficient evidence in the record to support the district court's finding that he had organized, managed, or supervised other participants in this criminal activity under section 3B1.1(c).

Despite that, Lewis insists that his role in the narcotics distribution conspiracy cannot be enhanced by the aggravated role he may have played in the money laundering scheme, particularly where the district court rejected the government's contention that Lewis had been a supervisor of the cocaine distribution activity itself. Yet we agree with the government that this fact would not prevent the district court from enhancing Lewis' offense level under section 3B1.1(c).

■ The money laundering activities charged separately in counts five through ten were also alleged in the count of conviction as acts in furtherance of the narcotics distribution conspiracy. For this reason, Lewis' plea agreement addressed the money laundering activities, and Lewis conceded that those activities had been undertaken to conceal the proceeds of his narcotics trafficking. Lewis also admitted in the plea agreement that he had used relatives and friends to purchase cashier's checks and money orders with drug proceeds and then to purchase real estate and other assets. Lewis therefore admitted that the money laundering activities had occurred and that those activities had been in furtherance of the charged conspiracy. Against this backdrop, it is difficult for Lewis to argue that the district court erred by relying on his role in the money laundering scheme to enhance his offense level under section 3B1.1(c). In considering whether to enhance a defendant's base offense level for his aggravated role in the offense, the district court is entitled to consider all relevant conduct within the scope of section 1B1.3. U.S.S.G. § 3B1.1 Introductory Commentary; *United States v. Montague*, 29 F.3d 317, 323–24 (7th Cir.1994). Conduct relevant to a drug distribution conspiracy includes acts taken in furtherance of the concerted criminal activity up to and including attempts "to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1). The money laundering activities here would therefore qualify as relevant conduct under section 1B1.3. As a result, the district court was entitled to consider

Lewis' supervisory role in those activities in applying section 3B1.1(c).

## III.

Lewis finally argues that the district court erred in refusing to depart downward from his sentencing range to reflect what he describes as extraordinary evidence of post-offense rehabilitation. Lewis contends that we have jurisdiction to review the district court's departure decision because the court believed it lacked any authority to depart even if Lewis' rehabilitative efforts could be characterized as extraordinary. The government, however, has a different view of the court's comments at the sentencing hearing. It suggests that the district court was willing to assume that post-offense rehabilitation may provide a basis for departure in a limited class of cases, but that the court denied a departure in this case because it did not find Lewis' rehabilitative efforts to be extraordinary. According to the government, then, the district court made a discretionary decision to deny the requested departure and thereby deprived this court of jurisdiction to review its decision.

■ Only when a refusal to depart results from the district court's erroneous belief that it lacks the legal authority to do so may we review that decision on appeal. *United States v. Brown,* 14 F.3d 337, 340 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 164, 130 L.Ed.2d 101 (1994); *United States v. Gaines,* 7 F.3d 101, 105 (7th Cir.1993). If, instead, the district court denies a departure in the exercise of its discretion, a defendant has no appellate remedy, for we are without jurisdiction to review such discretionary decisions. *United States v. Wright,* 37 F.3d 358, 360-61 (7th Cir.1994); *Gaines,* 7 F.3d at 105. In assessing our jurisdiction, then, we must determine whether the district court's decision was based on a purely legal conclusion under the Guidelines, or whether the court made a fact-based decision in the exercise of its discretion.

At the sentencing hearing below, Lewis argued that a departure was warranted due to his extraordinary efforts at rehabilitation. Lewis emphasized that after he had been incarcerated but before his sentencing, he had undergone treatment for his drug dependency, had taken classes to complete his high school equivalency degree, and had even begun work toward a bachelor's degree. In connection with his departure motion, Lewis provided the district court with copies of decisions from other circuits that allegedly would support a downward departure in his case. One such decision was *United States v. Harrington,* 947 F.2d 956, 962 (D.C.Cir. 1991) (Ruth Bader Ginsburg, J.), where the court concluded that post-offense drug rehabilitation may generally justify an acceptance of responsibility reduction under section 3E1.1, and, " 'if the rehabilitation is so extraordinary as to suggest its presence to a degree not adequately taken into consideration by the acceptance of responsibility reduction,' " possibly even a downward departure. (Quoting *United States v. Sklar,* 920 F.2d 107, 116 (1st Cir.1990)). In opposing Lewis' motion, the government argued that even if a downward departure may be warranted under *Harrington* in a truly extraordinary case, Lewis' post-offense conduct did not rise to that level. In the government's view, the rehabilitative efforts referenced by Lewis were not atypical; rather, similar efforts could be expected of any defendant who had been convicted but not yet sentenced. *See, e.g., Sklar,* 920 F.2d at 116–17 (some degree of presentence rehabilitation is to be expected and therefore falls "well shy of what ... is necessary to take cases out of the heartland").

■ After considering both arguments, the district court ruled as follows:

> [W]hile I do want to say that I am very pleased with the positive actions that Mr. Lewis has taken while he's been in custody, I think it's laudable, and to the extent that I have the power in the discretionary part of the sentence that is to be imposed, I certainly am going to take that into account in a very positive way.

> But ... as I understand the holding in *United States [v.] Harrington* and in the other cases that Mr. Lewis has presented, and there are others as he's indicated, I believe that defendant's efforts to enhance his education and overcome drug addiction

are ... mitigating circumstances that were considered by the Sentencing Commission and were not felt to justify or to be available to justify a downward reduction from [the] sentencing range. To some extent, I think the basis for that perhaps was the view that we expect persons to take advantage of these programs and ability to rehabilitate themselves. While the courts can take that into account in areas of discretion, the way the sentencing guidelines have been computed and have been determined assume such positive actions, and it certainly is not something that is so outside the ordinary circumstance that it should justify a downward departure.

It seems to me that nothing has been indicated that is so beyond, as I say, the normal circumstances that the sentencing commission would not have considered that this would be done, and in the Court's opinion does not justify a downward departure, but certainly does justify the Court in its discretion in determining sentencing within the sentencing range under the guidelines....

(R. 219, at 101–02.) When these comments are considered in context, it is clear that the district court denied Lewis' departure motion not because it lacked the legal authority to depart even in an extraordinary case, but because the court did not believe Lewis' rehabilitative efforts could be characterized in that way. The district court assumed, consistent with *Harrington*, that it could depart below the sentencing range if it found truly extraordinary rehabilitative efforts,[1] but the court simply found nothing out of the ordinary in Lewis' case. Because this was a factual and not a legal determination under the Guidelines, it represents an exercise of the district court's discretion that is not reviewable on appeal. *See Wright*, 37 F.3d at

361; *Brown*, 14 F.3d at 340; cf. *United States v. Canoy*, 38 F.3d 893, 903–04 (7th Cir.1994) (appellate court may review denial of departure where district court found extraordinary family circumstances but that Sentencing Guidelines did not permit a departure on that basis).

AFFIRMED.

---

1. Although unnecessary to our resolution of the jurisdictional question, we note that there currently is a split in the circuits over whether evidence of truly extraordinary post-offense rehabilitation may justify a downward departure under the Guidelines. *See United States v. Akin*, 62 F.3d 700, 702 n. 3 (5th Cir.1995) (listing five circuits that permit such departures, and six that do not). By virtue of our decision in *United States v. Bruder*, 945 F.2d 167, 172–73 (7th Cir. 1991) (en banc), other courts regularly place this circuit among those that forbid such departures even in extraordinary cases. *See, e.g., Akin*, 62 F.3d at 702 n. 3; *United States v. Ziegler*, 1 F.3d 1044, 1047 (10th Cir.1993). This case does not provide us the occasion to determine whether that interpretation of *Bruder* is correct. The district court found nothing out of the ordinary here that would require anything more than a reduction for acceptance of responsibility. We reserve further comment on the scope of *Bruder* for a case where resolution of that question is necessary to our decision.