In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 02-1635 & 02-1636

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JEFFREY D'AMBROSIA and DUANE PEDE,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 01 CR 121—**Barbara B. Crabb**, *Chief Judge.*

ARGUED SEPTEMBER 27, 2002—DECIDED DECEMBER 16, 2002

Before POSNER, RIPPLE, and MANION, *Circuit Judges.*

MANION, *Circuit Judge.* Duane Pede and Jeffrey D'Ambrosia pleaded guilty to using wire communication facilities to transmit wagering information in interstate and foreign commerce in violation of 18 U.S.C. §§ 2, 1084 ("Wire Wagering Act"), and to making false and fraudulent statements on income tax returns in violation of 26 U.S.C. § 7206(1). Pursuant to the terms of their plea agreements, the defendants also stipulated that from 1997 to 1999 they conspired to defraud the Internal Revenue Service by using the profits of an illegal offshore sports bookmaking operation to pay vendors and bettors, and by placing

profits from that operation and personal income in offshore bank accounts under nominee names. The district court sentenced each defendant to 60 months' imprisonment. The defendants appeal their sentences, and we affirm.

## I.

This case involves an elaborate scheme by Duane Pede and Jeffrey D'Ambrosia to operate an illegal sports book-making operation and to conceal income and assets from the Internal Revenue Service. In July 1995, Pede and D'Ambrosia merged their respective sports betting handi-capping companies—The Scoreboard, Inc. (Pede) and NSN, Inc. (D'Ambrosia)—to form Sports Spectrum, L.L.C. ("Sports Spectrum").[1] Sports Spectrum provided its cus-tomers with: (1) up-to-the-minute betting lines for sport-ing events over the telephone for a fee; (2) up-to-the-min-ute scores on sporting events over the telephone for a fee; (3) "guaranteed" winning picks on sporting events over the telephone through handicapping services; (4) sports bet-ting and online casino gambling through one of two sports books; and (5) internet access.

In August 1996, Pede and D'Ambrosia expanded Sports Spectrum's business interests by founding Gold Medal Sports Book ("Gold Medal"),[2] an offshore internet-based sports bookmaking operation incorporated and located on the island of Curacao in the Netherlands Antilles. Pede

---

[1] Sports Spectrum had offices in Las Vegas, Nevada, where D'Ambrosia resided, and in Nelsonville, Wisconsin, where Pede resided.

[2] Gold Medal entered a plea of guilty to RICO charges on December 3, 2001, agreeing to forfeit $3,528,617 and discontinue its business operations.

and D'Ambrosia placed profits from Gold Medal's operations in offshore bank accounts in the Bahamas under nominee names, some of which they used to pay Sports Spectrum (for printing services, database support, statistical analysis, and consulting and technical support services),[3] The Scoreboard (for consulting and technical support services), other vendors, and winning bettors.[4] The defendants also directed the distribution of Gold Medal profits to offshore banks as part of a deferred compensation program concocted by David Tedder, an attorney in Orlando, Florida, who marketed estate planning and asset

[3] Pede and D'Ambrosia also owned a printing company and bulk mailing business called Signature Press, which handled all of the printing jobs for the various Sports Spectrum entities, including the printing of scoring schedules for The Scoreboard; tout letters for the handicapping services of Jeff Allen Sports, Dan Pastorini Sports, Mike Wynn Sports, and Razor Sharp Sports; and marketing brochures for the sports book companies utilized by Sports Spectrum (i.e., Gold Medal and Seven Palms Casino). Gold Medal mailed letters and brochures to United States residents advertising its sports booking services, and solicited those individuals to place wagers over the telephone lines from the United States to Gold Medal in Curacao via a toll-free betting line.

[4] Gold Medal handled telephone and internet sports bets in excess of $33 million in 1996; $167 million in 1997; $119 million in 1998; $78 million in 1999, and $5.7 million in the first quarter of 2000. During the three and a half years it conducted business, Gold Medal took in approximately $402.7 million in wagers. A portion of the profits were distributed to investors as dividends or "return on capital," while a significant portion of the corporation's net profits were placed in deferred compensation accounts for the defendants and other senior staff in the manner described *infra*.

protection devices to his clients.[5] The defendants hired Tedder prior to the commencement of Gold Medal's business operations, and, following his advice, enrolled in a foreign deferred compensation program that he developed and maintained. Under this program, the defendants resigned from Sports Spectrum and entered into employment agreements with Surety Services Limited ("Surety Services"), a corporation located in Dublin, Ireland, which then loaned the defendants out to an independent United States employee leasing company known as Personal Leasing Services Company, Inc. ("PLSC"). PLSC, in turn, contracted with Sports Spectrum for the defendants' services. Sports Spectrum paid PLSC for these services, PLSC transferred the defendants' wages, i.e., "lease payments," to Surety Services, and Surety Services funneled the lease payments to offshore bank accounts in nominee names. According to Tedder, this process rendered the defendants' earnings "tax-free," and made the money available for use by them at any time by way of loans. D'Ambrosia joined Tedder's deferred compensation program in June 1997, placing a sizable portion of his personal savings into the plan from the outset. After entering into the program, D'Ambrosia's untaxed earnings and profits from Gold Medal were placed into an offshore account labeled Corpus Harem #XIII at Barclays Bank in Nassau, Bahamas. From 1997 to 1999, D'Ambrosia's untaxed earnings were approximately $3,638,234. Pede joined Tedder's program in December 1997, and his untaxed earnings and profits from Gold Medal were thereafter placed in an offshore account labeled Corpus Harem #VIII at Surety Bank and Trust in Nassau, Bahamas. From 1997 to 1999, Pede had

---

[5]  Unbeknownst to the defendants, Tedder had been disbarred from the practice of law at the time they retained his services.

untaxed earnings of $1,467,352 diverted to this offshore bank account.

In 1999, Pede and D'Ambrosia filed fraudulent income tax returns for tax year 1998. Schedule B, Part III, Line 7(a) of the 1998 1040 form required the defendants, under penalty of perjury, to answer the following question: "At any time during 1998, did you have any interest in or signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account?" Each defendant falsely answered "no" to this question on their respective tax returns, notwithstanding the fact that they both had financial interest in and signature authority over numerous foreign bank accounts.[6]

On November 16, 2001, a three-count information was filed against Pede and D'Ambrosia. Count One charged the defendants with using wire communication facilities to transmit wagering information in interstate and foreign commerce in violation of 18 U.S.C. §§ 2, 1084. Count Two charged defendant Pede with filing a false income tax return for tax year 1998 in violation of 26 U.S.C. § 7206(1). Count three charged defendant D'Ambrosia with filing a false income tax return for tax year 1998 in violation of 26 U.S.C. § 7206(1).[7]

---

[6] The defendants had signature authority over at least four foreign bank accounts: a Gold Medal account at ORCO Bank in Curacao; and accounts at Surety Bank in Nassau, Bahamas in the names of Gold Medal, Research Technology, and Global Access. They also had "actual authority" of the deferred compensation accounts noted *supra.*

[7] The government's investigation also determined that Pede and D'Ambrosia had engaged in money laundering and mail

(continued...)

On December 3, 2001, the defendants waived indictment and pleaded guilty to the three-count information. In written plea agreements, the defendants also stipulated that from 1997 to 1999 they conspired with one another and others to defraud the IRS by using Gold Medal's profits to pay Sports Spectrum, vendors, and bettors, and by placing some of the company's profits in offshore bank accounts under nominee names. The defendants stipulated that the tax loss resulting from this tax conspiracy amounted to $1,429,565. The district court accepted the defendants' guilty pleas, and in doing so held: (1) that the tax offenses and stipulated conduct (i.e., "tax conspiracy offenses") could be grouped together under U.S.S.G § 3D1.2(b) and (d);[8] and (2) that the tax conspiracy offenses could

---

[7] (...continued)
fraud. The defendants were not, however, charged with either of these offenses.

[8] Section 3D1.2—"Groups of Closely Related Counts"—provides that "[a]ll counts involving substantially the same harm shall be grouped together into a single Group." Counts involve substantially the same harm within the meaning of this rule:

  (a) When counts involve the same victim and the same act or transaction.

  (b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.

  (c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

  (d) When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate
(continued...)

then be grouped with the wagering offense under U.S.S.G. § 3D1.2(c) "because [the wagering offense] embodies conduct (criminal activity producing the source of income not correctly reported) that is treated as a specific offense characteristic in guideline 2T1.1,[9] which is applicable to

---

[8] (...continued)
   harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

The defendants do not challenge the propriety of the district court's decision to group the tax offenses with the stipulated conduct.

[9] Section 2T1.1, "Tax Evasion; Willful Failure to File Return, Supply Information, or Pay Tax; Fraudulent or False Returns, Statements, or Other Documents," provides:
   (a)  Base Offense Level:

       (1)  Level from § 2T4.1 (Tax Table) corresponding to the tax loss; or

       (2)  6, if there is no tax loss.

   (b)  Specific Offense Characteristics

       (1)  If the defendant failed to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity, increase by 2 levels. If the resulting offense level is less than level 12, increase to level 12.

       (2)  If the offense involved sophisticated means, increase by 2 levels. If the resulting offense level is less than level 12, increase to level 12.

   (c)  Special Instructions

       For the purposes of this guideline—

       (1) If the offense involved tax evasion or a fraudulent or false return, statement, or other document, the tax
                                                                    (continued...)

the stipulated conduct that constitutes a separate count for the purpose of sentencing." In calculating the defendants' sentences under the guidelines, the district court concluded that a four-level increase in the offense level was appropriate for their role in the grouped offense because it determined that Pede and D'Ambrosia "were the leaders and organizers of criminal activity that involved more than five participants or was otherwise extensive." The district court then used the offense level for the tax conspiracy (24), pursuant to U.S.S.G. § 3D1.3(a),[10] as the offense level for the grouped offenses, resulting in a sentencing guideline range of imprisonment of 51 to 63 months. The district court then sentenced each defendant to 60 months' imprisonment followed by one year of supervised release, and a fine of $100,000. The defendants appeal their sentences, challenging the district court's decision to group the wagering offense with the tax conspiracy offenses and to apply a four-level increase to their offense levels for being leaders or organizers of the tax conspiracy under U.S.S.G. § 3B1.1(a).

---

[9]  (...continued)
> loss is the total amount of loss that was the object of the offense (i.e., the loss that would have resulted had the offense been successfully completed).

[10]  Section 3D1.3(a), "Offense Level Applicable to Each Group of Closely Related Counts," provides that "[i]n the case of counts grouped together pursuant to § 3D1.2(a)-(c), the offense level applicable to a Group is the offense level, determined in accordance with Chapter Two and Parts A, B, and C of Chapter Three, for the most serious of the counts comprising the Group, i.e., the highest offense level of the counts in the Group."

## II.

We review the district court's application of the United States Sentencing Guidelines *de novo,* but defer to the court's findings of fact unless they are clearly erroneous. *See, e.g., United States v. Febus*, 218 F.3d 784, 795-96 (7th Cir. 2000).

The issue before us is whether the district court erred in applying a four-level enhancement to each of the defendants' sentences for being leaders or organizers of a tax conspiracy under U.S.S.G § 3B1.1. The defendants make two arguments on appeal. First, they contend that the district court should have applied the adjustment for role in offense, under § 3B1.1, prior to grouping as required by U.S.S.G. § 1B1.1(d).[11] Second, the defendants maintain that the district court erred in grouping the wagering offense with the tax conspiracy offenses, and that but for this error they would not have received four-level "organizer or leader" enhancements for the tax conspiracy offenses. Without the four-level sentencing enhance-

---

[11] Section 1B1.1(d) provides that "[i]f there are multiple counts of conviction, repeat steps (a) through (c) for each count. Apply Part D of Chapter Three to group the various counts and adjust the offense level accordingly." *Id.* Section 1B1.1(a)-(c) provide the following "application instructions":

(a)  Determine, pursuant to § 1B1.2 (Applicable Guidelines), the offense guideline section from Chapter Two (Offense Conduct) applicable to the offense of conviction. See § 1B1.2.

(b)  Determine the base offense level and apply any appropriate specific offense characteristics, cross references, and special instructions contained in the particular guideline in Chapter Two in the order listed.

(c)  Apply the adjustments as appropriate related to victim, role, and obstruction of justice from Parts A, B, and C of Chapter Three.

ment, the defendants would have been subject to a lower sentencing range, and therefore, presumably, would have received less prison time.

Because we conclude that the defendants are subject to the four-level "organizer-leader" enhancement regardless of whether the wagering offense and tax conspiracy offenses are analyzed separately or grouped together under § 3D1.2, we need not address whether the district court's grouping of these offenses was proper. *See, e.g., Williams v. United States*, 503 U.S. 193, 203 (1992) (holding that a remand is not necessary for a district court's misapplication of the sentencing guidelines if we conclude, on the record as a whole, that the error was harmless because it did not affect the district court's selection of the sentence imposed); *United States v. Saunders*, 129 F.3d 925, 932 (7th Cir. 1997) (same).

Our analysis in this case begins with the defendants' stipulations in their respective plea agreements that they conspired with David Tedder to defraud the IRS. Their stipulations are identical and provide as follows:

> Pursuant to USSG § 1B1.2(c),[12] the defendant stipulates that the government could prove that from 1997 to 1999, the defendant conspired with David Tedder [and co-defendant] to defraud the Internal Revenue Service by hiding income and assets. The defendant further stipulates that the government could prove that the tax loss associated with the conspiracy was $1,429,565, and was reasonably foreseeable to the defendant.

---

[12]  Section 1B1.2(c) directs that "[a] plea agreement . . . containing a stipulation that specifically establishes the commission of additional offense(s) shall be treated as if the defendant had been convicted of additional count(s) charging those offense(s)."

In analyzing whether the defendants played an "aggravating role" in the tax conspiracy, we turn to § 3B1.1, which "provides adjustments to the offense level based upon the role the defendant played in committing the offense." § 3B1.1, introductory commentary. Section 3B1.1(a) directs that "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels."

The defendants readily concede that they were leaders and/or organizers of an offshore sports book, Gold Medal, and that a four-level enhancement for their role in the wagering offense, under § 3B1.1(a), was therefore appropriate. The defendants take issue, however, with the district court's determination that they were also organizers and/or leaders of the tax conspiracy. They contend that their participation in the tax conspiracy was limited to their role as clients of David Tedder. In support of their argument, the defendants direct us to the fourth application note of § 3B1.1, which provides that:

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.

§ 3B1.1, commentary n.4.

Pede and D'Ambrosia contend that while they were participants in the tax conspiracy (i.e., providing the necessary funding and making investment suggestions), they did not control the total number of participants or the manner in which the monies were diverted as part of the deferred compensation scheme. The defendants also assert that they neither participated in the recruitment of accomplices nor "claimed right to a larger share of the fruits of the crime." In short, they claim that Tedder was the mastermind of the tax conspiracy because he: (1) developed and implemented the tax deferment scheme; (2) directed and employed associates and assistants who helped him manage their investments; (3) established the necessary banking relationships; (4) controlled the defendants' investments; (5) managed the offshore bank accounts; and (6) claimed the largest share of the fruits of the tax conspiracy by misappropriating the defendants' money. As such, the defendants maintain that the district court erred in applying a four-level "organizer or leader" enhancement to their tax conspiracy offenses per § 3B1.1(a).

The defendants' argument, however, fails to recognize that the determination of whether a defendant is an "organizer or leader" under § 3B1.1 "is to be made on the basis of all conduct within the scope of § 1B1.3 (Relevant Conduct), i.e., all conduct included under § 1B1.3(a)(1)-(4), *and not solely on the basis of the elements and acts cited in the count of the conviction.*" § 3B1.1, introductory commentary (emphasis added). Thus, in evaluating the extent of the defendants' role in the tax conspiracy under § 3B1.1, we look not only to their participation in the tax conspiracy but to any other conduct relevant to that conspiracy. *See, e.g., United States v. Bjorkman*, 270 F.3d 482, 496 (7th Cir. 2001); *United States v. Baker*, 227 F.3d 955, 966 (7th Cir. 2000); *United States v. Montague*, 29 F.3d 317, 323-24 (7th Cir. 1994). Relevant conduct includes "all acts and omis-

sions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant," § 1B1.3(a)(1)(A), and "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity," § 1B1.3(a)(1)(B), that "occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." § 1B1.3(a)(1)(A)-(B).

Here, there is no question that the defendants' operation of a multi-jurisdictional offshore sports bookmaking empire is clearly relevant in assessing their role in the tax conspiracy. Pede and D'Ambrosia were the leaders of their respective businesses, Sports Spectrum and Gold Medal. They consulted with one another frequently and together made decisions affecting these businesses, including decisions on investing money in the scheme established and managed by Tedder.[13] Specifically, the defendants conspired to evade taxes by placing the profits of Gold Medal in offshore bank accounts in nominee names and by using these nontaxed profits to fund Gold Medal's ongoing operations—i.e., paying vendors and winning bettors. In doing so, they directed staff within their own organizations to transfer money to accounts controlled by Tedder and assigned accountant Randy Moreau the task of monitoring the deferred compensation accounts for them. Furthermore, as the district court noted, "[t]he tax shelters . . . were an integral part of the corporate structure [of the defendants' gambling operation] . . . . Not only did the tax

---

[13] Tedder controlled his part of the organization by directing his staff to run component businesses that were "shell corporations" as part of the deferred compensation program.

shelters increase the profits obtained from the operation of the illegal betting scheme, they helped hide the existence of the corporations from federal regulators because the [defendants] did not report the income from the corporations."

That Pede and D'Ambrosia were neither organizers nor leaders of Tedder's deferred compensation program is of no consequence. The tax conspiracy offenses address the extent to which each defendant used Tedder's program to conceal from the IRS the income and assets they derived from Gold Medal's operations. We, therefore, agree with the district court that "it is not determinative whether [the defendants] exercised a leadership role over David Tedder and his colleagues. [They] exercised a leadership role over the entire scheme, a part of which was to hide assets and income through an illegal tax shelter." *See, e.g., United States v. Nicolaou,* 180 F.3d 565, 574 (4th Cir. 1999) (holding that defendant's leadership role in illegal gambling was relevant conduct supporting four-level leadership sentencing enhancement "because [the conduct] occurred during 'the commission of, and in preparation for' the money laundering . . . [and] [w]ithout the illegal gambling, there would have been no ill-gotten gains to launder."). *See also Febus,* 218 F.3d at 796 (holding that defendant's interim leadership of long-running illegal lottery was relevant conduct to gambling and conspiracy offenses, thus supporting four-level "organizer or leader" enhancement); *United States v. Damico,* 99 F.3d 1431, 1437 (7th Cir. 1996) (rejecting defendant's argument that his racketeering conduct was not relevant to his extortion-related conduct, for purposes of § 3B1.1(a)—i.e., that the extortion-related conduct involved only one person other than himself—because "section 3B1.1's use of the phrase 'criminal activity' is 'broad enough to include the entire racketeer-

ing conspiracy rather than the particular predicate act alone.' ") (citation omitted).[14]

The defendants' final argument is that their roles as leaders and organizers of the wagering offense should have no bearing on whether they were organizers and/or leaders of the tax conspiracy because "[t]he purpose of U.S.S.G. § 3B1.1 is [to] permit the district court to assess the relative culpability of one defendant to another participant . . . ." We rejected this same argument, however, in *United States v. Bjorkman*, 270 F.3d 482 (7th Cir. 2001),[15] noting:

> [The defendant] correctly notes that the purpose of § 3B1.1 is to assign punishment to defendants based upon their relative degree of responsibility for the "offense." However, this proposition aids [the defendant's] argument only if the term "offense" is construed narrowly as denoting only the offense of conviction, not including relevant conduct. Since we have rejected this construction of "offense," we must also reject [the defendant's] derivative argument from § 3B1.1's purpose.

*Id.* at 497.

---

[14] That the defendants consider Tedder to be the "bigger fish" in the tax conspiracy, even if true, has no bearing on whether they organized or exercised a leadership role in the tax conspiracy. *See* § 3B1.1, cmt. 4 ("There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy."). *Cf. Bjorkman*, 270 F.3d at 497 n.1.

[15] The dissent suggests that our reliance on *Bjorkman* is somehow misplaced because that case involved a grouping of multiple counts under § 3D1.2(d), an issue we do not address here. The fact that § 3B1.1 and § 3D1.2 *both* refer to § 1B1.3(a), however, makes this a distinction without a difference. As such, we see no reason why the *Bjorkman* Court's analysis is any less persuasive outside of the grouping context.

Therefore, whether the defendants' wagering and tax conspiracy offenses are evaluated separately or grouped together, the result remains the same: the tax conspiracy offenses incorporate the defendants' relevant conduct in operating a multi-jurisdictional offshore sports book betting empire, thus subjecting them to a four-level "organizer or leader" enhancement under § 3B1.1(a). *See, e.g., Nicolaou,* 180 F.3d 565, 574 (4th Cir. 1999) (holding "that even if grouping of money laundering and gambling were improper, or if a role adjustment were only to be applied prior to grouping, the four-level enhancement to the money-laundering sentence on the basis of a leadership role in the gambling offenses would be appropriate under the Guidelines [pursuant to § 1B1.3(a)(1)-(2)]").

### III.

For the reasons noted herein, we conclude that the district court's decision to apply a four-level "organizer or leader" enhancement to the defendants' tax conspiracy offenses, pursuant to § 3B1.1, was proper. The judgment of the district court is, therefore, AFFIRMED.

POSNER, *Circuit Judge,* dissenting.    The district court imposed the organizer enhancement on these two defendants after grouping the tax and gambling offenses. My colleagues now affirm on a different ground, that the gambling offense was relevant conduct.

I disagree but I wish they had at least said that the grouping was improper, as it plainly was, rather than ducking the issue. The government's defense of the district court's ruling was irresponsible. Not only was it a palpable error for the district court to group the two offenses, but since grouping usually results in a more lenient sentence (and would have done so here had the judge not improperly enhanced the sentences) the government is arguing against its long-term interests. Once again a local office of the Justice Department, indifferent as it seems to the implications of its position for the Department as a whole, has embraced a position rejected by the Department in its other cases. See *Adler v. Espy,* 35 F.3d 263, 264 (7th Cir. 1994); *Ortega v. United States,* 270 F.3d 540, 548-49 (8th Cir. 2001); *United States v. Bartlett,* 856 F.2d 1071, 1080 n. 13 (8th Cir. 1988); cf. *Woodhill Corp. v. Federal Emergency Management Agency,* 168 F.3d 1025, 1027-28 (7th Cir. 1999); *United States v. White,* 882 F.2d 250, 252 (7th Cir. 1989).

Grouping—the purpose and usual effect of which are to limit the defendant's sentence to the punishment for the most serious of the grouped offenses, U.S.S.G. ch. 3, pt. D, Introductory Commentary; *United States v. Runyan,* 290 F.3d 223, 251 (5th Cir. 2002); *United States v. Kalust,* 249 F.3d 106, 110 (2d Cir. 2001); *United States v. Reetz,* 18 F.3d 595, 598 and n. 3 (8th Cir. 1994); *United States v. Patterson,* 947 F.2d 635, 636-37 (2d Cir. 1991)—is done when a defendant is convicted of multiple counts so closely related that they essentially merge into a single offense; or, in the words of the guideline, when they inflict "substantially the

same harm." U.S.S.G. § 3D1.2. When, as in this case, the victims are different (the victims of the gambling offense are the community as a whole, as in other "victimless" crimes, and perhaps the gamblers themselves, if a paternalistic view is taken, while the victims of the tax offenses are the members of the taxpaying public), grouping is improper, as several cases hold with regard to the closely related question whether to group fraud and tax evasion. *Weinberger v. United States*, 268 F.3d 346, 354-55 (6th Cir. 2001); *United States v. Astorri*, 923 F.2d 1052, 1056-57 (3d Cir. 1991); *United States v. Vitale*, 159 F.3d 810, 813-15 (3d Cir. 1998); *United States v. Lindsay*, 184 F.3d 1138, 1142-43 (10th Cir. 1999).

I acknowledge the existence of contrary precedents, illustrated by *United States v. Gordon*, 291 F.3d 181, 189-90 (2d Cir. 2002), and *United States v. Haltom*, 113 F.3d 43, 46 (5th Cir. 1997), that allow the grouping of fraud and tax evasion, but their reasoning is not persuasive, especially if carried over to a case like this. It is common for illegal gambling enterprises to pay income taxes in order to avoid compounding their offenses, especially since, as this case illustrates, the tax offense will often be more serious than what in the case of gambling is little more than a "morals" offense. Gambling is extremely widespread in the United States and broadly approved; the moral distinction between the gambling that is legal and the gambling that is illegal is faint to the point of invisibility.

In *all* the cases I have cited or could cite on both sides of the question, except *Gordon*, where the government grudgingly acknowledged the existence of binding circuit precedent that required grouping, the government was arguing against grouping, which is to say against the position it is arguing for in this case. See also Brief for the United States in *Glover v. United States* (531 U.S. 198 (2001)), No. 99-8576, pp. 39-44.

I said that the *usual* effect, not the invariable effect, of grouping is to lighten the defendant's sentence. In *United States v. Bjorkman*, 270 F.3d 482, 495-97 (7th Cir. 2001) (per curiam), we held, pursuant to U.S.S.G. § 1B1.3(a)(2), that when offenses constituting parts of the "same course of conduct or common scheme or plan" are grouped under section 3D1.2(d) of the guidelines (which is done "when the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature . . ."), a managerial role in one of the grouped offenses can be automatically attached to the offense of conviction. For by definition offenses grouped on such a basis in such circumstances are not merely different characterizations of the same basic criminal activity but different building blocks of an overarching offense. A typical example would be where the defendant's offense level is determined by what may have been the relatively minor amount of drugs that he handled but it was part of a larger course of conduct in which he played a managerial role.

*Bjorkman* was such a case; this is not; the difference is made clear by *United States v. Ritsema*, 31 F.3d 559, 565-66 (7th Cir. 1994), which held that "section 1B1.3(a)(2) cannot be read to make Ritsema's obstruction of justice conduct relevant to his silencer offense [possession of an unregistered silencer] because by its terms, it applies only to offenses which would be grouped as multiple counts under section 3D1.2(d)." Substitute gambling for obstruction of justice and tax evasion for possessing an unregistered silencer and you have this case. In any event, my colleagues decline to decide whether grouping was proper in this case, making unintelligible their reliance on *Bjorkman*, a case that presupposed grouping—and under the inapplicable § 3D1.2(d), to boot. Pretending that the de-

fendants had been convicted only of the tax offense, my colleagues adopt the government's alternative argument that since that offense was related to the gambling offense and the sentencing guidelines provide that in deciding whether a defendant is an organizer the sentencing court should consider "relevant conduct," U.S.S.G. ch. 3, pt. B, Introductory Commentary; *United States v. Billingsley*, 115 F.3d 458, 465 (7th Cir. 1997); *United States v. Febus*, 218 F.3d 784, 796 (7th Cir. 2000), the defendants should be deemed organizers of the tax offense. This is a fiction. Their role in the tax offense was merely to accept the illegal advice of their tax lawyer. He concocted, organized, and implemented the offense. They are guilty too of course but are no more organizers of the offense than a thief who sells stolen property to a fence is an organizer of the fencing operation.

Is it a fiction commanded or countenanced by the sentencing guidelines? It is not. So far as bears on this case (since it is *not* a grouping case, or treated as one by the majority), relevant conduct is criminal activity "that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1). The offense of conviction was tax evasion, and the gambling activity that generated the income on which the defendants failed to pay taxes was not "in preparation for that offense." We have made clear that "factually related to" is not synonymous with "in preparation for." *United States v. Tai*, 994 F.2d 1204, 1213 (7th Cir. 1993). Nor is this a case like *United States v. Lewis*, 79 F.3d 688, 691-92 (7th Cir. 1996), where the relevant conduct was money laundering undertaken to shield the offense of conviction, which was the sale of cocaine, from detection. The government has it backwards: the tax evasion was an attempt to avoid discovery of the gambling

offense, not vice versa. And while the gambling offense and the tax offense overlapped in time, for an offense to "occur . . . during the commission of the offense of conviction" implies more than a temporal overlap, as we held in *United States v. Ritsema, supra*, 31 F.3d at 566-67; see also *United States v. Taylor*, 272 F.3d 980, 982-84 (7th Cir. 2001); compare *United States v. Ellison*, 113 F.3d 77, 83 (7th Cir. 1997). Otherwise, if the defendants had beaten their wives during the period in which they were beating taxes, the wife-beating offense would be deemed relevant conduct. The purpose of "during the commission" is, we explained in *Ritsema*, "to free the [sentencing] court from the strict confines of the indictment so that it may hold the defendant accountable for the full range of harms that stemmed from his offense conduct." 31 F.3d at 567. The harm from the defendants' tax evasion was not augmented by the fact that the income on which they evaded taxes was generated by gambling. The harm would have been the same had it been generated by lawful business dealings.

The guidelines' directive to consider relevant conduct in determining a defendant's status as an organizer pertains to situations in which the relevant conduct enables the court to identify the defendant as an organizer of the offense of which he was convicted. Suppose that that offense is a single sale of drugs to an undercover agent by the defendant at the door of a crack house and the relevant conduct is defendant's ownership and management of the crack house. Then it would be apparent that his role in relation to the sale had been that of an organizer rather than merely that of a sales clerk. See *United States v. Noble*, 246 F.3d 946, 954 (7th Cir. 2001); *United States v. McClinton*, 135 F.3d 1178, 1191 (7th Cir. 1998); see also *United States v. Lillard*, 929 F.2d 500, 503 (9th Cir. 1991); cf. my earlier discussion of grouping under U.S.S.G. § 3D1.2(d).

But the relevant conduct here, which is to say the gambling enterprise, does not demonstrate that the defendants played an organizing role in relation to the tax offense. All it demonstrates is the motive and source of funds for their dealings with the crooked tax lawyer.

A true Copy:

     Teste:

                              _____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*