**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 08-4161**

UNITED STATES OF AMERICA,

            Plaintiff – Appellee,

      v.

DAVID RHODES, a/k/a Crotch,

            Defendant – Appellant.

Appeal from the United States District Court for the Southern
District of West Virginia, at Charleston.  Joseph R. Goodwin,
Chief District Judge.  (2:07-cr-00042-1)

Argued:  March 27, 2009          Decided:  April 14, 2009

Before NIEMEYER, KING, and DUNCAN, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED**: Nicholas S. Preservati, PRESERVATI LAW OFFICES, PLLC,
Charleston, West Virginia, for Appellant.  Joshua Clarke Hanks,
OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia,
for Appellee.  **ON BRIEF**: Charles T. Miller, United States
Attorney, Charleston, West Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

David Rhodes, who pleaded guilty in the Southern District of West Virginia to a 21 U.S.C. § 846 drug conspiracy offense, appeals the seventy-month sentence imposed by the district court. More specifically, Rhodes challenges the court's application of a Sentencing Guidelines offense level increase for possession of a dangerous weapon during the conspiracy. See USSG § 2D1.1(b)(1) (2007) (the "weapon enhancement"). As explained below, we affirm.

I.

In March 2007, the grand jury in Beckley, West Virginia, returned a two-count indictment against Rhodes, charging him with (1) conspiracy to manufacture five grams or more of methamphetamine, in contravention of 21 U.S.C. § 846 (the "conspiracy offense"), and (2) possession of methamphetamine-making chemicals, in violation of 21 U.S.C. § 841(c)(2) (the "possession offense"). That September, Rhodes pleaded guilty to the conspiracy offense, pursuant to a written plea agreement, in exchange for the government's promise to move for dismissal of the possession offense. The district court accepted Rhodes's guilty plea, adjudged him guilty of the conspiracy offense, and scheduled sentencing proceedings.

2

According to Rhodes's Presentence Investigation Report (the "PSR"), the conspiracy offense involved a methamphetamine-manufacturing conspiracy that operated in Roane County, West Virginia, from late 2003 until September 29, 2006. The PSR reflects that Rhodes's activities in furtherance of the conspiracy included providing ingredients used to manufacture methamphetamine at the residence of Timothy Jones, arranging for Clyde McQuain to purchase ingredients used by Rhodes to cook methamphetamine at McQuain's home, and distributing methamphetamine to customers in Roane County. The PSR further reflects that Rhodes possessed several firearms during the conspiracy: for example, following coconspirator Jones's February 14, 2004 arrest on methamphetamine-related charges, Jones told police that, "about a month and a half before the . . . arrest, David Rhodes had a gun with a laser sight which he flashed on Mr. Jones' head." J.A. 109.[1] As detailed in the PSR, Rhodes was arrested on state charges on February 14, 2004, September 12, 2004, and September 29, 2006, with those charges later being dismissed in favor of the federal prosecution. Pursuant to the plea agreement, Rhodes and the government stipulated that "the total offense and relevant conduct is

---

[1] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal. The PSR is contained in a sealed volume of the Joint Appendix.

between 20 grams and 35 grams of actual methamphetamine, or between 200 grams and 350 grams of a mixture containing methamphetamine." Id. at 111.

The PSR calculated a total offense level of 27 for Rhodes under the Sentencing Guidelines: a base offense level of 28, see USSG § 2D1.1(c)(6) (2007); the two-level weapon enhancement, id. § 2D1.1(b)(1); and a three-level reduction for acceptance of responsibility, id. § 3E1.1. With a criminal history category of I, the resulting advisory sentencing range was seventy to eighty-seven months of imprisonment (within the statutory range of five to forty years).

Rhodes submitted written objections to the PSR, contending that application of the weapon enhancement would be improper. During the sentencing hearing conducted by the district court on November 26, 2007, the defense explained that "it is our position that [Rhodes] did not possess [a] firearm in furtherance of the conspiracy, and that the only firearms that were in his residence [at the time of his February 14, 2004 arrest] under the guidelines aren't attributable to him." J.A. 14.

The government presented two witnesses at the sentencing hearing. Coconspirator McQuain testified that he had witnessed various firearms in Rhodes's car during the time of the conspiracy and that Rhodes had told him about trading drugs for

4

firearms, but that he did not know of any connection between the various firearms and the conspiracy and that he had never seen Rhodes engaging in a drugs-for-firearms transaction. McQuain also testified that, at the time of his own June 14, 2004 arrest on state charges, police found two handguns under a couch in his home that had been left there earlier that day by Rhodes.

Trooper Frederick L. Hammack of the West Virginia State Police testified for the government that he had been assigned to the Spencer (Roane County) detachment since October 2003 and had been receiving information about Rhodes's methamphetamine-trafficking activities since late that year. Hammack testified that, on February 14, 2004, he had responded to a Roane County Sheriff's Department request for assistance after a shot was fired near coconspirator Jones's Tawney Hollow residence in southern Roane County. While Hammack and another officer were waiting at the mouth of the hollow for other officers to arrive, Rhodes drove up in his vehicle, and then parked and exited the vehicle to "lock[] in the hubs" for four-wheel drive. J.A. 29. Hammack and the other officer approached Rhodes, patted him down, obtained permission to search his vehicle, and, having found no contraband in the vehicle, sent him on his way. Later, however, the officers discovered a methamphetamine laboratory in Jones's residence and were told it belonged to Rhodes. Hammack then secured a search warrant for Rhodes's residence, a mobile

home located on West Virginia Route 36 in Roane County. There, Hammack found materials used to manufacture and distribute methamphetamine — mainly in the kitchen/living room area, but also in the bedroom — including "lots of little glassware, tubes, and things with residue in it," "a lot of sandwich bags with the corners cut out," and "blister packs of cold medication." J.A. 30.

Trooper Hammack testified during the sentencing hearing that he had also searched Rhodes's residence for "a black semi-automatic pistol with a laser sight on it," which he had previously been told by sources that Rhodes would "break . . . out just as an intimidation factor." J.A. 30-31. Hammack indeed found a firearm fitting that description in Rhodes's bedroom, along with one or two other firearms. Hammack acknowledged that he could not remember where in the bedroom the firearms were located (such as the closet or a dresser drawer), nor the precise number of firearms found (a total of two or three). He recalled the firearms being unloaded, and at least the black pistol with the laser sight not being enclosed in a gun case. When asked by the defense why he had not seized the firearms or mentioned them in his subsequent report (even though he had listed firearms in the search warrant application), Hammack explained:

At the time, I had never done any federal cases. In state court, firearms aren't — there's no enhancement. That's not the way things are here. And I was very inexperienced in that. And had I known what I know now, obviously I would have seized those firearms.

But at the time, it didn't really seem that significant because [Rhodes] wasn't a convicted felon. . . . [L]ooking back knowing what I know now, I would have taken them. But I didn't know. It was just inexperience.

J.A. 33.[2]

The defense called one witness at the sentencing hearing, Rhodes's girlfriend Shelley Lynn Wagner, who was residing with Rhodes and present in the home at the time of the February 14, 2004 search. Wagner testified that there were two or three firearms in the bedroom, including one pistol that belonged to her. According to Wagner, the firearms were kept unloaded in the top of the bedroom closet under clothes and other "junk," and thus were not easily accessible. J.A. 41. At least one of

---

[2] The defense pointed out to Trooper Hammack that, on the same day Rhodes's home was searched, the officers searching coconspirator Jones's residence (including Hammack) seized three loaded handguns from that residence. Hammack explained that the handguns were seized from Jones's residence because "[t]hose guns were the reason that I was called there," i.e., to assist with the response to a shot being fired, and "that was a dangerous situation for our guys when they went in [because the handguns] were loaded and either in hands or on a person." J.A. 35. By contrast, although Hammack had been told that Rhodes had used his black pistol with the laser sight to intimidate people, "Mr. Rhodes didn't have that firearm in his hands when we came in," and "[i]t wasn't an immediate threat to any of my officers." Id. at 36.

7

the firearms had a trigger lock, and at least one was kept in a locked case. Wagner did not know of any ammunition in the residence that fit those firearms.

After hearing argument from the parties, the district court discussed the applicable burden of proof for the weapon enhancement, explaining that "we are here to find by a preponderance of the evidence whether it was clearly improbable that a weapon present at a scene is connected with the offense." J.A. 53. That is, the government "need only show that a weapon was present and the enhancement applies unless the defendant carries a burden, unusual burden shifting in a criminal case[,] that it was clearly improbable that the gun was involved in the drug business." Id. at 54. The court advised that it was continuing the sentencing hearing until January 11, 2008, so that it could further deliberate on the applicability of the weapon enhancement. Before recessing, though, the court announced the following findings of fact:

> I find by a preponderance of the evidence that there were firearms present at the defendant's residence at the time a search warrant was conducted which also turned up methamphetamine residue and paraphernalia at that residence consistent with the manufacture of methamphetamine at some time at some place, and consistent with the defendant's guilt of being involved in a conspiracy to manufacture methamphetamine.

> I find . . . by a preponderance of the evidence that the weapons were in the bedroom, whereas the bulk of the evidence seized was in the living room area.

8

I further find by a preponderance of the evidence, based on the testimony of the state policeman, that the bedroom is in close proximity to the living room, it being a mobile home.

I make no finding about what weapons or the description of the weapons that were found as I can't readily determine a description of the weapons except that they appear to be handguns and not long guns. And that's the only finding I would make regarding the character of the guns.

* * *

[However,] I do find[,] based on the trooper's testimony[,] that one of the guns was black and had a laser sight, but I don't know what kind of gun it was.

J.A. 55-56.

The parties subsequently submitted supplemental memoranda to the district court. When the sentencing hearing resumed on January 11, 2008, the court announced that it was overruling Rhodes's objections to the weapon enhancement and finding "that the Government proved by a preponderance of the evidence that Mr. Rhodes possessed a firearm during the commission of the offense." J.A. 85. The court explained:

At the time the search warrant was executed, the firearms were discovered in the defendant's bedroom while methamphetamine residue and drug paraphernalia consistent with the manufacture of methamphetamine were discovered in the adjacent kitchen/living room area, and also within the bedroom.

Most of the stuff was in the kitchen and living room area, according to the evidence, but some glassware testing positive for methamphetamine residue was found in the bedroom where the guns were found.

9

Id. The court further found that it was "not clearly improbable that the firearms were connected to the offense." Id. On this point, the court explained:

> The guns found in Mr. Rhodes's bedroom were handguns, one having a laser sight, the fact of a weapon with a laser sight being consistent with one of the witness's statements in the [PSR] that he had seen Mr. Rhodes with a gun with a laser sight and which the witness said Mr. Rhodes had pointed at his head. The guns and drug paraphernalia were found in close proximity within the house.
>
> . . . .
>
> Again, Timothy Jones said that the methamphetamine was cooked in his residence and he's the one that talked about the laser sight.

Id. at 85-86. The court then confirmed that there were no "additional objections from either party," and expressly adopted the PSR based on the finding that there was "sufficient indicia of reliability to support the probable accuracy of the matters contained" therein. Id. at 86. Asked for clarification by the defense, the court stated that "[t]he weapons in [Rhodes's] home" — and not any firearms discussed by coconspirator McQuain in his testimony — "are the finding upon which I rely for the enhancement." Id. at 92.

The district court considered the advisory Guidelines range (seventy to eighty-seven months) and the 18 U.S.C. § 3553(a) factors, and then sentenced Rhodes to seventy months. That same day (January 11, 2008), the court entered its judgment,

10

reflecting Rhodes's conviction on the conspiracy offense, the dismissal of the possession offense on the government's motion, and the imposition of the seventy-month sentence.

Rhodes timely noted this appeal, challenging the court's application of the Guidelines weapon enhancement. We possess jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.


## II.

We review a sentence imposed by a district court for reasonableness, applying an abuse of discretion standard. See Gall v. United States, 128 S. Ct. 586, 591 (2007); United States v. Pauley, 511 F.3d 468, 473 (4th Cir. 2007). Generally, in order to determine whether a sentencing court has abused its discretion, we engage in a two-step analysis. Pauley, 511 F.3d at 473. First, we examine the sentence for "significant procedural errors," and, second, we evaluate the substance of the sentence. Id.

In this appeal, Rhodes challenges only the procedural reasonableness of his sentence. More specifically, he contends that the district court committed "significant procedural error" by "improperly calculating[] the Guidelines range." Gall, 128 S. Ct. at 597; see also id. at 596 (observing that "a district court should begin all sentencing proceedings by correctly

11

calculating the applicable Guidelines range"). In assessing whether a sentencing court properly applied the Guidelines, we review the court's factual findings for clear error and its legal conclusions de novo. See United States v. Osborne, 514 F.3d 377, 387 (4th Cir. 2008).

III.

For offenses falling under section 2D1.1 of the Sentencing Guidelines, the weapon enhancement provides for a two-level increase in the defendant's offense level "[i]f a dangerous weapon (including a firearm) was possessed." USSG § 2D1.1(b)(1) (2007). According to the Guidelines commentary, "[t]he enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons." Id. § 2D1.1 cmt. n.3. The Guidelines instruct that the enhancement "should be applied if the weapon was present," id. — that is, if the government shows "that the weapon was possessed during the relevant illegal drug activity," United States v. McAllister, 272 F.3d 228, 234 (4th Cir. 2001). The Guidelines further instruct, however, that the enhancement should not be applied if "it is clearly improbable that the weapon was connected with the offense." USSG § 2D1.1 cmt. n.3. "For example," the Guidelines illustrate, "the enhancement would not be applied if the

12

defendant, arrested at his residence, had an unloaded hunting rifle in the closet." Id.

Here, the district court properly recognized that, under our precedent, it was the government's burden to prove the presence of a weapon and Rhodes's burden to establish the clear improbability that the weapon was connected to his conspiracy offense. See United States v. Harris, 128 F.3d 850, 852-53 (4th Cir. 1997). In finding that the government had proven the presence of a weapon and that Rhodes had failed to establish that it was clearly improbable the weapon was connected with his offense, the court relied on the following findings of fact: (1) firearms and methamphetamine-making materials were present in Rhodes's residence at the time of the February 14, 2004 search thereof; (2) the bulk of the methamphetamine-making materials were found in the kitchen/living room area, but some such materials (including glassware testing positive for methamphetamine residue) were found in the nearby bedroom, where the firearms were also found; (3) the firearms were "handguns" and not "long guns"; (4) one of the handguns was black and had a laser sight, consistent with the description of a firearm that, according to coconspirator Jones, Rhodes had recently pointed at Jones's head; and (5) Jones had also stated that methamphetamine was cooked at his residence. See J.A. 55-56, 85-86. The information from Jones was outlined in Rhodes's PSR, which the

13

district court found to be sufficiently reliable and, thus, adopted.

Simply put, the district court did not clearly err in its application of the weapon enhancement. See McAllister, 272 F.3d at 234 (reviewing application of weapon enhancement for clear error). First of all, the presence of methamphetamine-related materials in Rhodes's residence while the conspiracy was ongoing, in close physical proximity to the firearms, was sufficient to support a finding that Rhodes possessed the firearms during the conspiracy. The evidence demonstrates that, even if methamphetamine was not cooked in Rhodes's home, methamphetamine-making materials were stored there in furtherance of the conspiracy. As we have recognized,

> possession of the weapon during the commission of the offense is all that is needed to invoke the [weapon] enhancement. . . . [W]hen the offense committed is conspiracy, [any geographical and temporal] proximity conditions are met when the weapon is discovered in a place where the conspiracy was carried out or furthered.

United States v. Apple, 962 F.2d 335, 338 (4th Cir. 1992); see also Harris, 128 F.3d at 852 ("We now unequivocally affirm the rule, already recognized in several other circuits, that the proximity of guns to illicit narcotics can support a district court's enhancement of a defendant's sentence under Section 2D1.1(b)(1).").

14

Furthermore, the application of the weapon enhancement to Rhodes is supported by the district court's finding that one of the firearms discovered in Rhodes's home — a black handgun with a laser sight — matched the description of a firearm that Rhodes had pointed at the head of Jones, who cooked methamphetamine as part of the conspiracy. The court was entitled to rely for its finding on information in the PSR, because there was no showing that this aspect of the PSR was inaccurate. See United States v. Love, 134 F.3d 595, 606 (4th Cir. 1998) ("Without an affirmative showing the information is inaccurate, the court is free to adopt the findings of the presentence report without more specific inquiry or explanation." (internal quotation marks and alterations omitted)).

We are not persuaded by Rhodes's attempts to show that the district court erred by not finding a clear improbability that the firearms discovered in his home on February 14, 2004, were connected to his conspiracy offense. For example, Rhodes points to the fact that Trooper Hammack declined to seize the firearms or note them in his subsequent report — a fact that demonstrates, in Rhodes's view, that "Hammack did not believe the weapons . . . were connected to the drug activity." Br. of Appellant 18. The sentencing court was entitled, however, to accept Hammack's explanation of why he did not seize Rhodes's firearms. Additionally, the court was not required to either

15

draw the inference that Hammack did not believe the firearms were connected to the conspiracy offense, or to deem any such belief to be binding on the court.

Rhodes also relies on the testimony of girlfriend Wagner that "[t]he weapons were unloaded [and] stored in a closet in the bedroom"; "[s]everal of the weapons had trigger locks or were placed in gun cases," with "[a]t least one of the gun cases [being] locked"; "[t]here was no ammunition for the guns in the residence"; and "[n]umerous items were placed on top of the weapons, thereby interfering with their accessibility." Br. of Appellant 19-20. Unfortunately for Rhodes, we have recognized "that the mere fact that a weapon is unloaded cannot prevent a court from enhancing a sentence under Section 2D1.1(b)(1)." Harris, 128 F.3d at 853 (explaining that "even an unloaded firearm enhances the risk of violence," in that such weapon may be "employ[ed] . . . to intimidate others" and "may encourage others to resort to weapons in response"). Moreover, simply because Rhodes's firearms were not in use or readily accessible at the time of the search does not mean they were not connected to the conspiracy, as demonstrated by the evidence that Rhodes had recently pointed one of the guns at coconspirator Jones's head. Indeed, the district court was careful to identify Rhodes's firearms as "handguns" and not "long guns," J.A. 56, thus implicitly equating them with the sort of firearms useful

16

to a drug manufacturing conspiracy, and distinguishing them from the unloaded hunting rifle in the closet that the Guidelines instruct would not justify the weapon enhancement.

In these circumstances, we must reject Rhodes's contention that the district court erred by applying the weapon enhancement in calculating his advisory Guidelines range.[3]  As such, the

---

[3] We also reject Rhodes's contention that the district court's application of the weapon enhancement contravened his constitutional rights.  More specifically, requiring Rhodes to show that it was clearly improbable that his firearms were connected to his drug conspiracy offense did not violate his due process rights, either by creating an impermissible presumption of a firearm-offense connection that it was his burden to rebut, or by imposing a too-stringent clearly improbable standard.  As one of our sister courts of appeals has explained,

> the language of the Guidelines does <u>not</u> require that a <u>connection</u> be shown.  Rather, it requires only that the weapon be <u>possessed</u> during commission of the offense.  The Commentary, therefore, creates an exception to the terms of the Guideline, not a presumption that a connection existed.  The Due Process Clause does not require that the government prove the absence of every possible exception or mitigating circumstance.

United States v. Restrepo, 884 F.2d 1294, 1296 (9th Cir. 1989); see also United States v. Bjorkman, 270 F.3d 482, 492-93 (7th Cir. 2001) (rejecting due process challenge to weapon enhancement burden-shifting scheme); United States v. McGhee, 882 F.2d 1095, 1097-99 (6th Cir. 1989) (same).

Finally, the weapon enhancement did not contravene Rhodes's Second Amendment rights.  Rhodes contends that, under District of Columbia v. Heller, 128 S. Ct. 2783 (2008), he was entitled to possess firearms in his home.  The Heller Court emphasized, however, that "the right secured by the Second Amendment is not unlimited," and that "nothing in our opinion should be taken to cast doubt on longstanding" regulatory measures, such as "prohibitions on the possession of firearms by felons and the (Continued)

17

court committed no significant procedural error, and thus did not abuse its discretion, in sentencing Rhodes.

IV.

Pursuant to the foregoing, we affirm the seventy-month sentence imposed by the district court on Rhodes.

AFFIRMED

---

mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  Id. at 2816-17 & n.26 (providing nonexhaustive list of "presumptively lawful regulatory measures").

18